(Slip Opinion)     OCTOBER TERM, 2009          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GRAHAM *v.* FLORIDA

### CERTIORARI TO THE DISTRICT COURT OF APPEAL OF FLORIDA, 1ST DISTRICT

No. 08–7412.   Argued November 9, 2009—Decided May 17, 2010;
modified July 6, 2010

Petitioner Graham was 16 when he committed armed burglary and another crime. Under a plea agreement, the Florida trial court sentenced Graham to probation and withheld adjudication of guilt. Subsequently, the trial court found that Graham had violated the terms of his probation by committing additional crimes. The trial court adjudicated Graham guilty of the earlier charges, revoked his probation, and sentenced him to life in prison for the burglary. Because Florida has abolished its parole system, the life sentence left Graham no possibility of release except executive clemency. He challenged his sentence under the Eighth Amendment's Cruel and Unusual Punishments Clause, but the State First District Court of Appeal affirmed.

*Held:* The Clause does not permit a juvenile offender to be sentenced to life in prison without parole for a nonhomicide crime. Pp. 7–31.

  (a) Embodied in the cruel and unusual punishments ban is the "precept . . . that punishment for crime should be graduated and proportioned to [the] offense." *Weems* v. *United States*, 217 U. S. 349, 367. The Court's cases implementing the proportionality standard fall within two general classifications. In cases of the first type, the Court has considered all the circumstances to determine whether the length of a term-of-years sentence is unconstitutionally excessive for a particular defendant's crime. The second classification comprises cases in which the Court has applied certain categorical rules against the death penalty. In a subset of such cases considering the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. *E.g., Kennedy* v. *Louisiana*, 554 U. S. ___, ___. In a second subset, cases turning on the offender's characteristics, the Court has prohibited death

for defendants who committed their crimes before age 18, *Roper* v. *Simmons*, 543 U. S. 551, or whose intellectual functioning is in a low range, *Atkins* v. *Virginia*, 536 U. S. 304. In cases involving categorical rules, the Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. *Roper*, *supra,* at 563. Next, looking to "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," *Kennedy*, *supra,* at ___, the Court determines in the exercise of its own independent judgment whether the punishment in question violates the Constitution, *Roper, supra*, at 564. Because this case implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes, the appropriate analysis is the categorical approach used in *Atkins, Roper,* and *Kennedy*. Pp. 7–10.

(b) Application of the foregoing approach convinces the Court that the sentencing practice at issue is unconstitutional. Pp. 10–31.

(1) Six jurisdictions do not allow life without parole sentences for any juvenile offenders. Seven jurisdictions permit life without parole for juvenile offenders, but only for homicide crimes. Thirty-seven States, the District of Columbia, and the Federal Government permit sentences of life without parole for a juvenile nonhomicide offender in some circumstances. The State relies on these data to argue that no national consensus against the sentencing practice in question exists. An examination of actual sentencing practices in those jurisdictions that permit life without parole for juvenile nonhomicide offenders, however, discloses a consensus against the sentence. Nationwide, there are only 123 juvenile offenders serving life without parole sentences for nonhomicide crimes. Because 77 of those offenders are serving sentences imposed in Florida and the other 46 are imprisoned in just 10 States, it appears that only 11 jurisdictions nationwide in fact impose life without parole sentences on juvenile nonhomicide offenders, while 26 States, the District of Columbia, and the Federal Government do not impose them despite apparent statutory authorization. Given that the statistics reflect nearly all juvenile nonhomicide offenders who have received a life without parole sentence stretching back many years, moreover, it is clear how rare these sentences are, even within the States that do sometimes impose them. While more common in terms of absolute numbers than the sentencing practices in, *e.g., Atkins* and *Enmund* v. *Florida*, 458 U. S. 782, the type of sentence at issue is actually as rare as those other sentencing practices when viewed in proportion to the opportunities for its imposition. The fact that many jurisdictions do not expressly prohibit the

Syllabus

sentencing practice at issue is not dispositive because it does not necessarily follow that the legislatures in those jurisdictions have deliberately concluded that such sentences would be appropriate. See *Thompson* v. *Oklahoma*, 487 U. S. 815, 826, n. 24, 850. Pp. 10–16.

(2) The inadequacy of penological theory to justify life without parole sentences for juvenile nonhomicide offenders, the limited culpability of such offenders, and the severity of these sentences all lead the Court to conclude that the sentencing practice at issue is cruel and unusual. No recent data provide reason to reconsider *Roper*'s holding that because juveniles have lessened culpability they are less deserving of the most serious forms of punishment. 543 U. S., at 551. Moreover, defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of such punishments than are murderers. *E.g., Kennedy, supra.* Serious nonhomicide crimes "may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' . . . they cannot be compared to murder in their 'severity and irrevocability.'" *Id.,* at ___. Thus, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. Age and the nature of the crime each bear on the analysis. As for the punishment, life without parole is "the second most severe penalty permitted by law," *Harmelin* v. *Michigan*, 501 U. S. 957, 1001, and is especially harsh for a juvenile offender, who will on average serve more years and a greater percentage of his life in prison than an adult offender, see, *e.g., Roper, supra*, at 572. And none of the legitimate goals of penal sanctions—retribution, deterrence, incapacitation, and rehabilitation, see *Ewing* v. *California*, 538 U. S. 11, 25—is adequate to justify life without parole for juvenile nonhomicide offenders, see, *e.g., Roper,* 543 U. S., at 571, 573. Because age "18 is the point where society draws the line for many purposes between childhood and adulthood," it is the age below which a defendant may not be sentenced to life without parole for a nonhomicide crime. *Id.,* at 574. A State is not required to guarantee eventual freedom to such an offender, but must impose a sentence that provides some meaningful opportunity for release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. Pp. 16–24.

(3) A categorical rule is necessary, given the inadequacy of two alternative approaches to address the relevant constitutional concerns. First, although Florida and other States have made substantial efforts to enact comprehensive rules governing the treatment of youthful offenders, such laws allow the imposition of the type of sentence at issue based only on a discretionary, subjective judgment by a

judge or jury that the juvenile offender is irredeemably depraved, and are therefore insufficient to prevent the possibility that the offender will receive such a sentence despite a lack of moral culpability. Second, a case-by-case approach requiring that the particular offender's age be weighed against the seriousness of the crime as part of a gross disproportionality inquiry would not allow courts to distinguish with sufficient accuracy the few juvenile offenders having sufficient psychological maturity and depravity to merit a life without parole sentence from the many that have the capacity for change. Cf. *Roper, supra*, at 572–573. Nor does such an approach take account of special difficulties encountered by counsel in juvenile representation, given juveniles' impulsiveness, difficulty thinking in terms of long-term benefits, and reluctance to trust adults. A categorical rule avoids the risk that, as a result of these difficulties, a court or jury will erroneously conclude that a particular juvenile is sufficiently culpable to deserve life without parole for a nonhomicide. It also gives the juvenile offender a chance to demonstrate maturity and reform. Pp. 24–29.

(4) Additional support for the Court's conclusion lies in the fact that the sentencing practice at issue has been rejected the world over: The United States is the only Nation that imposes this type of sentence. While the judgments of other nations and the international community are not dispositive as to the meaning of the Eighth Amendment, the Court has looked abroad to support its independent conclusion that a particular punishment is cruel and unusual. See, *e.g., Roper, supra*, at 575–578. Pp. 29–31.

982 So. 2d 43, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. STEVENS, J., filed a concurring opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. ROBERTS, C. J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, and in which ALITO, J., joined as to Parts I and III. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–7412

## TERRANCE JAMAR GRAHAM, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF APPEAL
OF FLORIDA, FIRST DISTRICT

[May 17, 2010; modified July 6, 2010]

JUSTICE KENNEDY delivered the opinion of the Court.

The issue before the Court is whether the Constitution
permits a juvenile offender to be sentenced to life in prison
without parole for a nonhomicide crime.  The sentence was
imposed by the State of Florida.  Petitioner challenges the
sentence under the Eighth Amendment's Cruel and Un-
usual Punishments Clause, made applicable to the States
by the Due Process Clause of the Fourteenth Amendment.
*Robinson* v. *California*, 370 U. S. 660 (1962).

I

Petitioner is Terrance Jamar Graham.  He was born on
January 6, 1987.  Graham's parents were addicted to
crack cocaine, and their drug use persisted in his early
years.  Graham was diagnosed with attention deficit hy-
peractivity disorder in elementary school.  He began
drinking alcohol and using tobacco at age 9 and smoked
marijuana at age 13.

In July 2003, when Graham was age 16, he and three
other school-age youths attempted to rob a barbeque
restaurant in Jacksonville, Florida.  One youth, who
worked at the restaurant, left the back door unlocked just

before closing time. Graham and another youth, wearing masks, entered through the unlocked door. Graham's masked accomplice twice struck the restaurant manager in the back of the head with a metal bar. When the manager started yelling at the assailant and Graham, the two youths ran out and escaped in a car driven by the third accomplice. The restaurant manager required stitches for his head injury. No money was taken.

Graham was arrested for the robbery attempt. Under Florida law, it is within a prosecutor's discretion whether to charge 16- and 17-year-olds as adults or juveniles for most felony crimes. Fla. Stat. §985.227(1)(b) (2003) (subsequently renumbered at §985.557(1)(b) (2007)). Graham's prosecutor elected to charge Graham as an adult. The charges against Graham were armed burglary with assault or battery, a first-degree felony carrying a maximum penalty of life imprisonment without the possibility of parole, §§810.02(1)(b), (2)(a) (2003); and attempted armed-robbery, a second-degree felony carrying a maximum penalty of 15 years' imprisonment, §§812.13(2)(b), 777.04(1), (4)(a), 775.082(3)(c).

On December 18, 2003, Graham pleaded guilty to both charges under a plea agreement. Graham wrote a letter to the trial court. After reciting "this is my first and last time getting in trouble," he continued "I've decided to turn my life around." App. 379–380. Graham said "I made a promise to God and myself that if I get a second chance, I'm going to do whatever it takes to get to the [National Football League]." *Id.*, at 380.

The trial court accepted the plea agreement. The court withheld adjudication of guilt as to both charges and sentenced Graham to concurrent 3-year terms of probation. Graham was required to spend the first 12 months of his probation in the county jail, but he received credit for the time he had served awaiting trial, and was released on June 25, 2004.

Less than 6 months later, on the night of December 2, 2004, Graham again was arrested. The State's case was as follows: Earlier that evening, Graham participated in a home invasion robbery. His two accomplices were Meigo Bailey and Kirkland Lawrence, both 20-year-old men. According to the State, at 7 p.m. that night, Graham, Bailey, and Lawrence knocked on the door of the home where Carlos Rodriguez lived. Graham, followed by Bailey and Lawrence, forcibly entered the home and held a pistol to Rodriguez's chest. For the next 30 minutes, the three held Rodriguez and another man, a friend of Rodriguez, at gunpoint while they ransacked the home searching for money. Before leaving, Graham and his accomplices barricaded Rodriguez and his friend inside a closet.

The State further alleged that Graham, Bailey, and Lawrence, later the same evening, attempted a second robbery, during which Bailey was shot. Graham, who had borrowed his father's car, drove Bailey and Lawrence to the hospital and left them there. As Graham drove away, a police sergeant signaled him to stop. Graham continued at a high speed but crashed into a telephone pole. He tried to flee on foot but was apprehended. Three handguns were found in his car.

When detectives interviewed Graham, he denied involvement in the crimes. He said he encountered Bailey and Lawrence only after Bailey had been shot. One of the detectives told Graham that the victims of the home invasion had identified him. He asked Graham, "Aside from the two robberies tonight how many more were you involved in?" Graham responded, "Two to three before tonight." *Id.*, at 160. The night that Graham allegedly committed the robbery, he was 34 days short of his 18th birthday.

On December 13, 2004, Graham's probation officer filed with the trial court an affidavit asserting that Graham had violated the conditions of his probation by possessing

a firearm, committing crimes, and associating with persons engaged in criminal activity. The trial court held hearings on Graham's violations about a year later, in December 2005 and January 2006. The judge who presided was not the same judge who had accepted Graham's guilty plea to the earlier offenses.

Graham maintained that he had no involvement in the home invasion robbery; but, even after the court underscored that the admission could expose him to a life sentence on the earlier charges, he admitted violating probation conditions by fleeing. The State presented evidence related to the home invasion, including testimony from the victims. The trial court noted that Graham, in admitting his attempt to avoid arrest, had acknowledged violating his probation. The court further found that Graham had violated his probation by committing a home invasion robbery, by possessing a firearm, and by associating with persons engaged in criminal activity.

The trial court held a sentencing hearing. Under Florida law the minimum sentence Graham could receive absent a downward departure by the judge was 5 years' imprisonment. The maximum was life imprisonment. Graham's attorney requested the minimum nondeparture sentence of 5 years. A presentence report prepared by the Florida Department of Corrections recommended that Graham receive an even lower sentence—at most 4 years' imprisonment. The State recommended that Graham receive 30 years on the armed burglary count and 15 years on the attempted armed robbery count.

After hearing Graham's testimony, the trial court explained the sentence it was about to pronounce:

"Mr. Graham, as I look back on your case, yours is really candidly a sad situation. You had, as far as I can tell, you have quite a family structure. You had a lot of people who wanted to try and help you get your

life turned around including the court system, and you had a judge who took the step to try and give you direction through his probation order to give you a chance to get back onto track. And at the time you seemed through your letters that that is exactly what you wanted to do. And I don't know why it is that you threw your life away. I don't know why.

"But you did, and that is what is so sad about this today is that you have actually been given a chance to get through this, the original charge, which were very serious charges to begin with. . . . The attempted robbery with a weapon was a very serious charge.

.     .     .     .     .

"[I]n a very short period of time you were back before the Court on a violation of this probation, and then here you are two years later standing before me, literally the—facing a life sentence as to—up to life as to count 1 and up to 15 years as to count 2.

"And I don't understand why you would be given such a great opportunity to do something with your life and why you would throw it away. The only thing that I can rationalize is that you decided that this is how you were going to lead your life and that there is nothing that we can do for you. And as the state pointed out, that this is an escalating pattern of criminal conduct on your part and that we can't help you any further. We can't do anything to deter you. This is the way you are going to lead your life, and I don't know why you are going to. You've made that decision. I have no idea. But, evidently, that is what you decided to do.

"So then it becomes a focus, if I can't do anything to help you, if I can't do anything to get you back on the right path, then I have to start focusing on the community and trying to protect the community from your

actions. And, unfortunately, that is where we are to-day is I don't see where I can do anything to help you any further. You've evidently decided this is the direction you're going to take in life, and it's unfortunate that you made that choice.

"I have reviewed the statute. I don't see where any further juvenile sanctions would be appropriate. I don't see where any youthful offender sanctions would be appropriate. Given your escalating pattern of criminal conduct, it is apparent to the Court that you have decided that this is the way you are going to live your life and that the only thing I can do now is to try and protect the community from your actions." *Id.,* at 392–394.

The trial court found Graham guilty of the earlier armed burglary and attempted armed robbery charges. It sentenced him to the maximum sentence authorized by law on each charge: life imprisonment for the armed burglary and 15 years for the attempted armed robbery. Because Florida has abolished its parole system, see Fla. Stat. §921.002(1)(e) (2003), a life sentence gives a defendant no possibility of release unless he is granted executive clemency.

Graham filed a motion in the trial court challenging his sentence under the Eighth Amendment. The motion was deemed denied after the trial court failed to rule on it within 60 days. The First District Court of Appeal of Florida affirmed, concluding that Graham's sentence was not grossly disproportionate to his crimes. 982 So. 2d 43 (2008). The court took note of the seriousness of Graham's offenses and their violent nature, as well as the fact that they "were not committed by a pre-teen, but a seventeen-year-old who was ultimately sentenced at the age of nineteen." *Id.,* at 52. The court concluded further that Graham was incapable of rehabilitation. Although Graham

"was given an unheard of probationary sentence for a life felony, . . . wrote a letter expressing his remorse and promising to refrain from the commission of further crime, and . . . had a strong family structure to support him," the court noted, he "rejected his second chance and chose to continue committing crimes at an escalating pace." *Ibid.* The Florida Supreme Court denied review. 990 So. 2d 1058 (2008) (table).

We granted certiorari. 556 U. S. ___ (2009).

## II

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976) (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy* v. *Louisiana*, 554 U. S. ___, ___ (2008) (slip op., at 8) (quoting *Furman* v. *Georgia*, 408 U. S. 238, 382 (1972) (Burger, C. J., dissenting)).

The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances. See, *e.g., Hope* v. *Pelzer*, 536 U. S. 730 (2002). "[P]unishments of torture," for example, "are forbidden." *Wilkerson* v. *Utah*, 99 U. S. 130, 136 (1879). These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes.

For the most part, however, the Court's precedents

consider punishments challenged not as inherently bar-
baric but as disproportionate to the crime.  The concept of
proportionality is central to the Eighth Amendment.
Embodied in the Constitution's ban on cruel and unusual
punishments is the "precept of justice that punishment for
crime should be graduated and proportioned to [the] of-
fense." *Weems* v. *United States*, 217 U. S. 349, 367 (1910).

The Court's cases addressing the proportionality of
sentences fall within two general classifications.  The first
involves challenges to the length of term-of-years sen-
tences given all the circumstances in a particular case.
The second comprises cases in which the Court imple-
ments the proportionality standard by certain categorical
restrictions on the death penalty.

In the first classification the Court considers all of the
circumstances of the case to determine whether the sen-
tence is unconstitutionally excessive.   Under this ap-
proach, the Court has held unconstitutional a life without
parole sentence for the defendant's seventh nonviolent
felony, the crime of passing a worthless check.  *Solem* v.
*Helm*, 463 U. S. 277 (1983).   In other cases, however, it
has been difficult for the challenger to establish a lack of
proportionality.  A leading case is *Harmelin* v. *Michigan*,
501 U. S. 957 (1991), in which the offender was sentenced
under state law to life without parole for possessing a
large quantity of cocaine.  A closely divided Court upheld
the sentence.  The controlling opinion concluded that the
Eighth Amendment contains a "narrow proportionality
principle," that "does not require strict proportionality
between crime and sentence" but rather "forbids only
extreme sentences that are 'grossly disproportionate' to
the crime." *Id.,* at 997, 1000–1001 (KENNEDY, J., concur-
ring in part and concurring in judgment).  Again closely
divided, the Court rejected a challenge to a sentence of 25
years to life for the theft of a few golf clubs under Califor-
nia's so-called three-strikes recidivist sentencing scheme.

*Ewing* v. *California*, 538 U. S. 11 (2003); see also *Lockyer* v. *Andrade*, 538 U. S. 63 (2003). The Court has also up-held a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses, *Rummel* v. *Estelle*, 445 U. S. 263 (1980), and a sentence of 40 years for possession of mari-juana with intent to distribute and distribution of mari-juana, *Hutto* v. *Davis*, 454 U. S. 370 (1982) *(per curiam)*.

The controlling opinion in *Harmelin* explained its ap-proach for determining whether a sentence for a term of years is grossly disproportionate for a particular defen-dant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. 501 U. S., at 1005 (opinion of KENNEDY, J.). "[I]n the rare case in which [this] threshold comparison . . . leads to an infer-ence of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Ibid.* If this comparative analysis "vali-date[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. *Ibid.*

The second classification of cases has used categorical rules to define Eighth Amendment standards. The previ-ous cases in this classification involved the death penalty. The classification in turn consists of two subsets, one considering the nature of the offense, the other consider-ing the characteristics of the offender. With respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. *Kennedy*, *supra,* at \_\_ (slip op., at 28); see also *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Coker* v. *Georgia*, 433 U. S. 584 (1977). In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defen-dants who committed their crimes before the age of 18,

*Roper* v. *Simmons*, 543 U. S. 551 (2005), or whose intellec-
tual functioning is in a low range, *Atkins* v. *Virginia*, 536
U. S. 304 (2002). See also *Thompson* v. *Oklahoma*, 487
U. S. 815 (1988).

In the cases adopting categorical rules the Court has
taken the following approach. The Court first considers
"objective indicia of society's standards, as expressed in
legislative enactments and state practice" to determine
whether there is a national consensus against the sentenc-
ing practice at issue. *Roper*, *supra,* at 563. Next, guided
by "the standards elaborated by controlling precedents
and by the Court's own understanding and interpretation
of the Eighth Amendment's text, history, meaning, and
purpose," *Kennedy*, 554 U. S., at ___ (slip op., at 10), the
Court must determine in the exercise of its own inde-
pendent judgment whether the punishment in question
violates the Constitution. *Roper, supra*, at 564.

The present case involves an issue the Court has not
considered previously: a categorical challenge to a term-of-
years sentence. The approach in cases such as *Harmelin*
and *Ewing* is suited for considering a gross proportionality
challenge to a particular defendant's sentence, but here a
sentencing practice itself is in question. This case impli-
cates a particular type of sentence as it applies to an
entire class of offenders who have committed a range of
crimes. As a result, a threshold comparison between the
severity of the penalty and the gravity of the crime does
not advance the analysis. Here, in addressing the ques-
tion presented, the appropriate analysis is the one used in
cases that involved the categorical approach, specifically
*Atkins, Roper,* and *Kennedy*.

## III
### A

The analysis begins with objective indicia of national
consensus. "[T]he 'clearest and most reliable objective

evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Atkins, supra,* at 312 (quoting *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989)). Six jurisdictions do not allow life without parole sentences for any juvenile offenders. See Appendix, *infra*, Part III. Seven jurisdictions permit life without parole for juvenile offenders, but only for homicide crimes. *Id.,* Part II. Thirty-seven States as well as the District of Columbia permit sentences of life without parole for a juvenile non-homicide offender in some circumstances. *Id.,* Part I. Federal law also allows for the possibility of life without parole for offenders as young as 13. See, *e.g.,* 18 U. S. C. §§2241 (2006 ed. and Supp. II), 5032 (2006 ed.). Relying on this metric, the State and its *amici* argue that there is no national consensus against the sentencing practice at issue.

This argument is incomplete and unavailing. "There are measures of consensus other than legislation." *Kennedy, supra,* at \_\_\_ (slip op., at 22). Actual sentencing practices are an important part of the Court's inquiry into consensus. See *Enmund, supra,* at 794–796; *Thompson, supra,* at 831–832 (plurality opinion); *Atkins, supra,* at 316; *Roper, supra,* at 564–565; *Kennedy, supra,* at \_\_\_ (slip op., at 22–23). Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, those sentences are most infrequent. According to a recent study, nationwide there are only 109 juvenile offenders serving sentences of life without parole for nonhomicide offenses. See P. Annino, D. Rasmussen, & C. Rice, Juvenile Life without Parole for Non-Homicide Offenses: Florida Compared to Nation 2 (Sept. 14, 2009) (hereinafter Annino).

The State contends that this study's tally is inaccurate

because it does not count juvenile offenders who were convicted of both a homicide and a nonhomicide offense, even when the offender received a life without parole sentence for the nonhomicide. See Brief for Respondent 34; Tr. of Oral Arg. in *Sullivan* v. *Florida*, O. T. 2009, No. 08–7621, pp. 28–31. This distinction is unpersuasive. Juvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide. It is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination. The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.

Florida further criticizes this study because the authors were unable to obtain complete information on some States and because the study was not peer reviewed. See Brief for Respondent 40. The State does not, however, provide any data of its own. Although in the first instance it is for the litigants to provide data to aid the Court, we have been able to supplement the study's findings. The study's authors were not able to obtain a definitive tally for Nevada, Utah, or Virginia. See Annino 11–13. Our research shows that Nevada has five juvenile nonhomicide offenders serving life without parole sentences, Utah has none, and Virginia has eight. See Letter from Alejandra Livingston, Offender Management Division, Nevada Dept. of Corrections, to Supreme Court Library (Mar. 26, 2010) (available in Clerk of Court's case file); Letter from Steve Gehrke, Utah Dept. of Corrections, to Supreme Court Library (Mar. 29, 2010) (same); Letter from Dr. Tama S. Celi, Virginia Dept. of Corrections, to Supreme Court Library (Mar. 30, 2010) (same). Finally, since the study was completed, a defendant in Oklahoma has apparently

been sentenced to life without parole for a rape and stabbing he committed at the age of 16. See Stogsdill, Delaware County Teen Sentenced in Rape, Assault Case, Tulsa World, May 4, 2010, p. A12.

Thus, adding the individuals counted by the study to those we have been able to locate independently, there are 123 juvenile nonhomicide offenders serving life without parole sentences. A significant majority of those, 77 in total, are serving sentences imposed in Florida. Annino 2. The other 46 are imprisoned in just 10 States—California, Delaware, Iowa, Louisiana, Mississippi, Nebraska, Nevada, Oklahoma, South Carolina, and Virginia. *Id.,* at 14; *supra*, at 12–13; Letter from Thomas P. Hoey, Dept. of Corrections, Government of the District of Columbia, to Supreme Court Library (Mar. 31, 2010) (available in Clerk of Court's case file); Letter from Judith Simon Garrett, U. S. Dept. of Justice, Federal Bureau of Prisons (BOP), to Supreme Court Library (Apr. 9, 2010) (available in Clerk of Court's case file). Thus, only 11 jurisdictions nationwide in fact impose life without parole sentences on juvenile nonhomicide offenders—and most of those do so quite rarely—while 26 States, the District of Columbia, and the Federal Government do not impose them despite statutory authorization.*

The numbers cited above reflect all current convicts in a

——————

*When issued, the Court's opinion relied on a report from the BOP stating that there are six juvenile nonhomicide offenders serving life without parole in the federal system. The Acting Solicitor General subsequently informed the Court that further review revealed that none of the six prisoners referred to in the earlier BOP report is serving a life without parole sentence solely for a juvenile nonhomicide crime completed before the age of 18. Letter from Neal Kumar Katyal, Acting Solicitor General, to William K. Suter, Clerk of Court (May 24, 2010) (available in Clerk of Court's case file). The letter further stated that the Government was not aware of any other federal prisoners serving life without parole sentences solely for juvenile nonhomicide crimes. *Ibid.* The opinion was amended in light of this new information.

jurisdiction's penal system, regardless of when they were convicted. It becomes all the more clear how rare these sentences are, even within the jurisdictions that do sometimes impose them, when one considers that a juvenile sentenced to life without parole is likely to live in prison for decades. Thus, these statistics likely reflect nearly all juvenile nonhomicide offenders who have received a life without parole sentence stretching back many years. It is not certain that this opinion has identified every juvenile nonhomicide offender nationwide serving a life without parole sentence, for the statistics are not precise. The available data, nonetheless, are sufficient to demonstrate how rarely these sentences are imposed even if there are isolated cases that have not been included in the presentations of the parties or the analysis of the Court.

It must be acknowledged that in terms of absolute numbers juvenile life without parole sentences for nonhomicides are more common than the sentencing practices at issue in some of this Court's other Eighth Amendment cases. See, *e.g., Enmund*, 458 U. S., at 794 (only six executions of nontriggerman felony murderers between 1954 and 1982) *Atkins*, 536 U. S., at 316 (only five executions of mentally retarded defendants in 13-year period). This contrast can be instructive, however, if attention is first given to the base number of certain types of offenses. For example, in the year 2007 (the most recent year for which statistics are available), a total of 13,480 persons, adult and juvenile, were arrested for homicide crimes. That same year, 57,600 juveniles were arrested for aggravated assault; 3,580 for forcible rape; 34,500 for robbery; 81,900 for burglary; 195,700 for drug offenses; and 7,200 for arson. See Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Statistical Briefing Book, online at http://ojjdp.ncjrs.org/ojstatbb/ (as visited May 14, 2010, and available in Clerk of Court's case file). Although it is not certain how many of these numerous juvenile offend-

ers were eligible for life without parole sentences, the comparison suggests that in proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual.

The evidence of consensus is not undermined by the fact that many jurisdictions do not prohibit life without parole for juvenile nonhomicide offenders. The Court confronted a similar situation in *Thompson*, where a plurality concluded that the death penalty for offenders younger than 16 was unconstitutional. A number of States then allowed the juvenile death penalty if one considered the statutory scheme. As is the case here, those States authorized the transfer of some juvenile offenders to adult court; and at that point there was no statutory differentiation between adults and juveniles with respect to authorized penalties. The plurality concluded that the transfer laws show "that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), *but tells us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders*." 487 U. S., at 826, n. 24. Justice O'Connor, concurring in the judgment, took a similar view. *Id.,* at 850 ("When a legislature provides for some 15-year-olds to be processed through the adult criminal justice system, and capital punishment is available for adults in that jurisdiction, the death penalty becomes at least theoretically applicable to such defendants. . . . [H]owever, it does not necessarily follow that the legislatures in those jurisdictions have deliberately concluded that it would be appropriate").

The same reasoning obtains here. Many States have chosen to move away from juvenile court systems and to allow juveniles to be transferred to, or charged directly in, adult court under certain circumstances. Once in adult court, a juvenile offender may receive the same sentence

as would be given to an adult offender, including a life
without parole sentence. But the fact that transfer and
direct charging laws make life without parole possible for
some juvenile nonhomicide offenders does not justify a
judgment that many States intended to subject such of-
fenders to life without parole sentences.

For example, under Florida law a child of any age can be
prosecuted as an adult for certain crimes and can be sen-
tenced to life without parole. The State acknowledged at
oral argument that even a 5-year-old, theoretically, could
receive such a sentence under the letter of the law. See
Tr. of Oral Arg. 36–37. All would concede this to be unre-
alistic, but the example underscores that the statutory
eligibility of a juvenile offender for life without parole does
not indicate that the penalty has been endorsed through
deliberate, express, and full legislative consideration.
Similarly, the many States that allow life without parole
for juvenile nonhomicide offenders but do not impose the
punishment should not be treated as if they have ex-
pressed the view that the sentence is appropriate. The
sentencing practice now under consideration is exceed-
ingly rare. And "it is fair to say that a national consensus
has developed against it." *Atkins, supra,* at 316.

B

Community consensus, while "entitled to great weight,"
is not itself determinative of whether a punishment is
cruel and unusual. *Kennedy*, 554 U. S., at ___ (slip op., at
24). In accordance with the constitutional design, "the
task of interpreting the Eighth Amendment remains our
responsibility." *Roper*, 543 U. S., at 575. The judicial
exercise of independent judgment requires consideration
of the culpability of the offenders at issue in light of their
crimes and characteristics, along with the severity of the
punishment in question. *Id.,* at 568; *Kennedy, supra,* at
___ (slip op., at 27–28); cf. *Solem*, 463 U. S., at 292. In this

inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. *Kennedy*, *supra,* at ___ (slip op., at 30–36); *Roper*, *supra,* at 571–572; *Atkins*, *supra,* at 318–320.

*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U. S., at 569. As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." *Id.,* at 569–570. These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.*, at 573. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.*, at 569. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson*, *supra,* at 835 (plurality opinion).

No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. as *Amici Curiae* 16–24; Brief for American Psychological Association et al. as *Amici Curiae* 22–27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U. S., at 570. It remains true that "[f]rom a moral standpoint it would be misguided to

equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid.* These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.

The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. *Kennedy, supra; Enmund*, 458 U. S. 782; *Tison* v. *Arizona*, 481 U. S. 137 (1987); *Coker*, 433 U. S. 584. There is a line "between homicide and other serious violent offenses against the individual." *Kennedy*, 554 U. S., at ___ (slip op., at 27). Serious nonhomicide crimes "may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' . . . they cannot be compared to murder in their 'severity and irrevocability.'" *Id.,* at ___ (slip op., at 28) (quoting *Coker,* 433 U. S., at 598 (plurality opinion)). This is because "[l]ife is over for the victim of the murderer," but for the victim of even a very serious nonhomicide crime, "life . . . is not over and normally is not beyond repair." *Ibid.* (plurality opinion). Although an offense like robbery or rape is "a serious crime deserving serious punishment," *Enmund*, *supra,* at 797, those crimes differ from homicide crimes in a moral sense.

It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.

As for the punishment, life without parole is "the second most severe penalty permitted by law." *Harmelin*, 501 U. S., at 1001 (opinion of KENNEDY, J.). It is true that a death sentence is "unique in its severity and irrevocabil-

ity," *Gregg* v. *Georgia*, 428 U. S. 153, 187 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. *Solem,* 463 U. S., at 300–301. As one court observed in overturning a life without parole sentence for a juvenile defendant, this sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Naovarath* v. *State*, 105 Nev. 525, 526, 779 P. 2d 944 (1989).

The Court has recognized the severity of sentences that deny convicts the possibility of parole. In *Rummel*, 445 U. S. 263, the Court rejected an Eighth Amendment challenge to a life sentence for a defendant's third nonviolent felony but stressed that the sentence gave the defendant the possibility of parole. Noting that "parole is an established variation on imprisonment of convicted criminals," it was evident that an analysis of the petitioner's sentence "could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life." *Id.,* at 280–281 (internal quotation marks omitted). And in *Solem*, the only previous case striking down a sentence for a term of years as grossly disproportionate, the defendant's sentence was deemed "far more severe than the life sentence we considered in *Rummel*," because it did not give the defendant the possibility of parole. 463 U. S., at 297.

Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will

on average serve more years and a greater percentage of
his life in prison than an adult offender.  A 16-year-old
and a 75-year-old each sentenced to life without parole
receive the same punishment in name only.  See *Roper*,
*supra,* at 572; cf. *Harmelin*, *supra,* at 996 ("In some cases
. . . there will be negligible difference between life without
parole and other sentences of imprisonment—for example,
. . . a lengthy term sentence without eligibility for parole,
given to a 65-year-old man").  This reality cannot be
ignored.

The penological justifications for the sentencing practice
are also relevant to the analysis.  *Kennedy*, *supra,* at ___
(slip op., at 30–36); *Roper*, 543 U. S., at 571–572; *Atkin*s,
*supra,* at 318–320.  Criminal punishment can have differ-
ent goals, and choosing among them is within a legisla-
ture's discretion.  See *Harmelin, supra,* at 999 (opinion of
KENNEDY, J.) ("[T]he Eighth Amendment does not man-
date adoption of any one penological theory").  It does not
follow, however, that the purposes and effects of penal
sanctions are irrelevant to the determination of Eighth
Amendment restrictions.  A sentence lacking any legiti-
mate penological justification is by its nature dispropor-
tionate to the offense.  With respect to life without parole
for juvenile nonhomicide offenders, none of the goals of
penal sanctions that have been recognized as legitimate—
retribution, deterrence, incapacitation, and rehabilitation,
see *Ewing*, 538 U. S., at 25 (plurality opinion)—provides
an adequate justification.

Retribution is a legitimate reason to punish, but it
cannot support the sentence at issue here.  Society is
entitled to impose severe sanctions on a juvenile nonhomi-
cide offender to express its condemnation of the crime and
to seek restoration of the moral imbalance caused by the
offense.  But "[t]he heart of the retribution rationale is
that a criminal sentence must be directly related to the
personal culpability of the criminal offender."  *Tison*, 481

U. S., at 149. And as *Roper* observed, "[w]hether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult." 543 U. S., at 571. The case becomes even weaker with respect to a juvenile who did not commit homicide. *Roper* found that "[r]etribution is not proportional if the law's most severe penalty is imposed" on the juvenile murderer. *Ibid.* The considerations underlying that holding support as well the conclusion that retribution does not justify imposing the second most severe penalty on the less culpable juvenile nonhomicide offender.

Deterrence does not suffice to justify the sentence either. *Roper* noted that "the same characteristics that render juveniles less culpable than adults suggest . . . that juveniles will be less susceptible to deterrence." *Ibid.* Because juveniles' "lack of maturity and underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions," *Johnson* v. *Texas*, 509 U. S. 350, 367 (1993), they are less likely to take a possible punishment into consideration when making decisions. This is particularly so when that punishment is rarely imposed. That the sentence deters in a few cases is perhaps plausible, but "[t]his argument does not overcome other objections." *Kennedy*, 554 U. S., at \_\_\_ (slip op., at 31). Even if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered. Here, in light of juvenile nonhomicide offenders' diminished moral responsibility, any limited deterrent effect provided by life without parole is not enough to justify the sentence.

Incapacitation, a third legitimate reason for imprisonment, does not justify the life without parole sentence in question here. Recidivism is a serious risk to public

safety, and so incapacitation is an important goal. See *Ewing, supra,* at 26 (plurality opinion) (statistics show 67 percent of former inmates released from state prisons are charged with at least one serious new crime within three years). But while incapacitation may be a legitimate penological goal sufficient to justify life without parole in other contexts, it is inadequate to justify that punishment for juveniles who did not commit homicide. To justify life without parole on the assumption that the juvenile of-fender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorri-gible. The characteristics of juveniles make that judgment questionable. "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper, supra,* at 573. As one court concluded in a challenge to a life without parole sentence for a 14-year-old, "incorrigibility is inconsistent with youth." *Workman* v. *Commonwealth,* 429 S. W. 2d 374, 378 (Ky. App. 1968).

Here one cannot dispute that this defendant posed an immediate risk, for he had committed, we can assume, serious crimes early in his term of supervised release and despite his own assurances of reform. Graham deserved to be separated from society for some time in order to prevent what the trial court described as an "escalating pattern of criminal conduct," App. 394, but it does not follow that he would be a risk to society for the rest of his life. Even if the State's judgment that Graham was incor-rigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset. A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity. Incapacitation cannot override all other considerations,

lest the Eighth Amendment's rule against disproportionate sentences be a nullity.

Finally there is rehabilitation, a penological goal that forms the basis of parole systems. See *Solem,* 463 U. S., at 300; *Mistretta* v. *United States,* 488 U. S. 361, 363 (1989). The concept of rehabilitation is imprecise; and its utility and proper implementation are the subject of a substantial, dynamic field of inquiry and dialogue. See, *e.g.,* Cullen & Gendreau, Assessing Correctional Rehabilitation: Policy, Practice, and Prospects, 3 Criminal Justice 2000, pp. 119–133 (2000) (describing scholarly debates regarding the effectiveness of rehabilitation over the last several decades). It is for legislatures to determine what rehabilitative techniques are appropriate and effective.

A sentence of life imprisonment without parole, however, cannot be justified by the goal of rehabilitation. The penalty forswears altogether the rehabilitative ideal. By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability. A State's rejection of rehabilitation, moreover, goes beyond a mere expressive judgment. As one *amicus* notes, defendants serving life without parole sentences are often denied access to vocational training and other rehabilitative services that are available to other inmates. See Brief for Sentencing Project as *Amicus Curiae* 11–13. For juvenile offenders, who are most in need of and receptive to rehabilitation, see Brief for J. Lawrence Aber et al. as *Amici Curiae* 28–31 (hereinafter Aber Brief), the absence of rehabilitative opportunities or treatment makes the disproportionality of the sentence all the more evident.

In sum, penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders. This determination; the limited culpability of juvenile non-

homicide offenders; and the severity of life without parole sentences all lead to the conclusion that the sentencing practice under consideration is cruel and unusual. This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime. *Roper*, 543 U. S., at 574.

A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.

## C

Categorical rules tend to be imperfect, but one is necessary here. Two alternative approaches are not adequate to address the relevant constitutional concerns. First, the State argues that the laws of Florida and other States governing criminal procedure take sufficient account of the age of a juvenile offender. Here, Florida notes that under its law prosecutors are required to charge 16- and 17-year-old offenders as adults only for certain serious felonies; that prosecutors have discretion to charge those offenders as adults for other felonies; and that prosecutors may not charge nonrecidivist 16- and 17-year-old offenders as adults for misdemeanors. Brief for Respondent 54 (citing Fla. Stat. §985.227 (2003)). The State also stresses that "in only the narrowest of circumstances" does Florida law impose no age limit whatsoever for prosecuting juveniles in adult court. Brief for Respondent 54.

Florida is correct to say that state laws requiring consideration of a defendant's age in charging decisions are salutary. An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed. Florida, like other States, has made substantial efforts to enact comprehensive rules governing the treatment of youthful offenders by its criminal justice system. See generally Fla. Stat. §958 *et seq.* (2007).

The provisions the State notes are, nonetheless, by themselves insufficient to address the constitutional concerns at issue. Nothing in Florida's laws prevents its courts from sentencing a juvenile nonhomicide offender to life without parole based on a subjective judgment that the defendant's crimes demonstrate an "irretrievably depraved character." *Roper, supra,* at 570. This is inconsistent with the Eighth Amendment. Specific cases are illustrative. In Graham's case the sentencing judge decided to impose life without parole—a sentence greater

than that requested by the prosecutor—for Graham's armed burglary conviction. The judge did so because he concluded that Graham was incorrigible: "[Y]ou decided that this is how you were going to lead your life and that there is nothing that we can do for you. . . . We can't do anything to deter you." App. 394.

Another example comes from *Sullivan* v. *Florida*, No. 08–7621. *Sullivan* was argued the same day as this case, but the Court has now dismissed the writ of certiorari in *Sullivan* as improvidently granted. *Post,* p. ___. The facts, however, demonstrate the flaws of Florida's system. The petitioner, Joe Sullivan, was prosecuted as an adult for a sexual assault committed when he was 13 years old. Noting Sullivan's past encounters with the law, the sentencing judge concluded that, although Sullivan had been "given opportunity after opportunity to upright himself and take advantage of the second and third chances he's been given," he had demonstrated himself to be unwilling to follow the law and needed to be kept away from society for the duration of his life. Brief for Respondent in *Sullivan* v. *Florida*, O. T. 2009, No. 08–7621, p. 6. The judge sentenced Sullivan to life without parole. As these examples make clear, existing state laws, allowing the imposition of these sentences based only on a discretionary, subjective judgment by a judge or jury that the offender is irredeemably depraved, are insufficient to prevent the possibility that the offender will receive a life without parole sentence for which he or she lacks the moral culpability.

Another possible approach would be to hold that the Eighth Amendment requires courts to take the offender's age into consideration as part of a case-specific gross disproportionality inquiry, weighing it against the seriousness of the crime. This approach would allow courts to account for factual differences between cases and to impose life without parole sentences for particularly heinous

crimes. Few, perhaps no, judicial responsibilities are more difficult than sentencing. The task is usually undertaken by trial judges who seek with diligence and professionalism to take account of the human existence of the offender and the just demands of a wronged society.

The case-by-case approach to sentencing must, however, be confined by some boundaries. The dilemma of juvenile sentencing demonstrates this. For even if we were to assume that some juvenile nonhomicide offenders might have "sufficient psychological maturity, and at the same time demonstrat[e] sufficient depravity," *Roper*, 543 U. S., at 572, to merit a life without parole sentence, it does not follow that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change. *Roper* rejected the argument that the Eighth Amendment required only that juries be told they must consider the defendant's age as a mitigating factor in sentencing. The Court concluded that an "unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Id.,* at 573. Here, as with the death penalty, "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive" a sentence of life without parole for a nonhomicide crime "despite insufficient culpability." *Id.,* at 572–573.

Another problem with a case-by-case approach is that it does not take account of special difficulties encountered by counsel in juvenile representation. As some *amici* note, the features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings. Juveniles mistrust adults and have limited

understandings of the criminal justice system and the
roles of the institutional actors within it. They are less
likely than adults to work effectively with their lawyers to
aid in their defense. Brief for NAACP Legal Defense &
Education Fund et al. as *Amici Curiae* 7–12; Henning,
Loyalty, Paternalism, and Rights: Client Counseling
Theory and the Role of Child's Counsel in Delinquency
Cases, 81 Notre Dame L. Rev. 245, 272–273 (2005). Diffi-
culty in weighing long-term consequences; a corresponding
impulsiveness; and reluctance to trust defense counsel
seen as part of the adult world a rebellious youth rejects,
all can lead to poor decisions by one charged with a juve-
nile offense. Aber Brief 35. These factors are likely to
impair the quality of a juvenile defendant's representa-
tion. Cf. *Atkins*, 536 U. S., at 320 ("Mentally retarded
defendants may be less able to give meaningful assistance
to their counsel"). A categorical rule avoids the risk that,
as a result of these difficulties, a court or jury will errone-
ously conclude that a particular juvenile is sufficiently
culpable to deserve life without parole for a nonhomicide.

Finally, a categorical rule gives all juvenile nonhomicide
offenders a chance to demonstrate maturity and reform.
The juvenile should not be deprived of the opportunity to
achieve maturity of judgment and self-recognition of hu-
man worth and potential. In *Roper*, that deprivation
resulted from an execution that brought life to its end.
Here, though by a different dynamic, the same concerns
apply. Life in prison without the possibility of parole gives
no chance for fulfillment outside prison walls, no chance
for reconciliation with society, no hope. Maturity can lead
to that considered reflection which is the foundation for
remorse, renewal, and rehabilitation. A young person who
knows that he or she has no chance to leave prison before
life's end has little incentive to become a responsible indi-
vidual. In some prisons, moreover, the system itself be-
comes complicit in the lack of development. As noted

above, see *supra,* at 23, it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration. A categorical rule against life without parole for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term.

Terrance Graham's sentence guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes. The State has denied him any chance to later demonstrate that he is fit to rejoin society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law. This the Eighth Amendment does not permit.

## D

There is support for our conclusion in the fact that, in continuing to impose life without parole sentences on juveniles who did not commit homicide, the United States adheres to a sentencing practice rejected the world over. This observation does not control our decision. The judgments of other nations and the international community are not dispositive as to the meaning of the Eighth Amendment. But "'[t]he climate of international opinion concerning the acceptability of a particular punishment'" is also "'not irrelevant.'" *Enmund*, 458 U. S., at 796, n. 22. The Court has looked beyond our Nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual. See, *e.g., Roper*, 543 U. S., at 575–578; *Atkins, supra,* at 317–318, n. 21; *Thompson*, 487 U. S., at 830 (plurality opinion); *Enmund, supra,* at 796–797, n. 22; *Coker*, 433 U. S., at 596, n. 10

(plurality opinion); *Trop*, 356 U. S., at 102–103 (plurality opinion).

Today we continue that longstanding practice in noting the global consensus against the sentencing practice in question. A recent study concluded that only 11 nations authorize life without parole for juvenile offenders under any circumstances; and only 2 of them, the United States and Israel, ever impose the punishment in practice. See M. Leighton & C. de la Vega, Sentencing Our Children to Die in Prison: Global Law and Practice 4 (2007). An updated version of the study concluded that Israel's "laws allow for parole review of juvenile offenders serving life terms," but expressed reservations about how that parole review is implemented. De la Vega & Leighton, Sentencing Our Children to Die in Prison: Global Law and Practice, 42 U. S. F. L. Rev. 983, 1002–1003 (2008). But even if Israel is counted as allowing life without parole for juvenile offenders, that nation does not appear to impose that sentence for nonhomicide crimes; all of the seven Israeli prisoners whom commentators have identified as serving life sentences for juvenile crimes were convicted of homicide or attempted homicide. See Amnesty International, Human Rights Watch, The Rest of Their Lives: Life without Parole for Child Offenders in the United States 106, n. 322 (2005); Memorandum and Attachment from Ruth Levush, Law Library of Congress, to Supreme Court Library (Feb. 16, 2010) (available in Clerk of Court's case file).

Thus, as petitioner contends and respondent does not contest, the United States is the only Nation that imposes life without parole sentences on juvenile nonhomicide offenders. We also note, as petitioner and his *amici* emphasize, that Article 37(a) of the United Nations Convention on the Rights of the Child, Nov. 20, 1989, 1577 U. N. T. S. 3 (entered into force Sept. 2, 1990), ratified by every nation except the United States and Somalia, pro-

hibits the imposition of "life imprisonment without possibility of release . . . for offences committed by persons below eighteen years of age." Brief for Petitioner 66; Brief for Amnesty International et al. as *Amici Curiae* 15–17. As we concluded in *Roper* with respect to the juvenile death penalty, "the United States now stands alone in a world that has turned its face against" life without parole for juvenile nonhomicide offenders. 543 U. S., at 577.

The State's *amici* stress that no international legal agreement that is binding on the United States prohibits life without parole for juvenile offenders and thus urge us to ignore the international consensus. See Brief for Solidarity Center for Law and Justice et al. as *Amici Curiae* 14–16; Brief for Sixteen Members of United States House of Representatives as *Amici Curiae* 40–43. These arguments miss the mark. The question before us is not whether international law prohibits the United States from imposing the sentence at issue in this case. The question is whether that punishment is cruel and unusual. In that inquiry, "the overwhelming weight of international opinion against" life without parole for nonhomicide offenses committed by juveniles "provide[s] respected and significant confirmation for our own conclusions." *Roper*, *supra,* at 578.

The debate between petitioner's and respondent's *amici* over whether there is a binding *jus cogens* norm against this sentencing practice is likewise of no import. See Brief for Amnesty International 10–23; Brief for Sixteen Members of United States House of Representatives 4–40. The Court has treated the laws and practices of other nations and international agreements as relevant to the Eighth Amendment not because those norms are binding or controlling but because the judgment of the world's nations that a particular sentencing practice is inconsistent with basic principles of decency demonstrates that the Court's rationale has respected reasoning to support it.

\*     \*     \*

The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term. The judgment of the First District Court of Appeal of Florida affirming Graham's conviction is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

APPENDIX

## I. JURISDICTIONS THAT PERMIT LIFE WITHOUT PAROLE FOR JUVENILE NONHOMICIDE OFFENDERS

| | |
|---|---|
| Alabama | Ala. Code §12–15–203 (Supp. 2009); §§13A–3–3, 13A–5–9(c), 13A–6–61 (2005); §13A–7–5 (Supp. 2009) |
| Arizona | Ariz. Rev. Stat. Ann. §§13–501, §13–1423 (West 2010) |
| Arkansas | Ark. Code §9–27–318(b) (2009); §5–4–501(c) (Supp. 2009) |
| California | Cal. Penal Code Ann. §667.7(a)(2) (1999); §1170.17 (2004) |
| Delaware | Del. Code Ann., Tit., 10, §1010 (Supp. 2008); *id.,* Tit., 11, §773(c) (2003) |
| District of Columbia | D. C. Code §16–2307 (2009 Supp. Pamphlet); §22–3020 (Supp. 2007) |
| Florida | Fla. Stat. §§810.02, 921.002(1)(e), 985.557 (2007) |
| Georgia | Georgia Code Ann. §15–11–30.2 (2008); §16–6–1(b) (2007) |
| Idaho | Idaho Code §18–6503 (Lexis 2005); §§19–2513, 20–509 (Lexis Supp. 2009) |
| Illinois | Ill. Comp. Stat., ch. 705, §§405/5–805, 405/5–130 (West 2008); *id.*, ch. 720, §5/12–13(b)(3) (West 2008); *id.,* ch. 730, §5/3-3-3(d) (West 2008) |
| Indiana | Ind. Code §31–30–3–6(1); §35–50–2–8.5(a) (West 2004) |
| Iowa | Iowa Code §§232.45(6), 709.2, 902.1 (2009) |
| Louisiana | La. Child. Code Ann., Arts. 305, 857(A), (B) (West Supp. 2010); La. Stat. Ann. §14:44 (West 2007) |
| Maryland | Md. Cts. & Jud. Proc. Code Ann. §§3–8A–03(d)(1), 3–8A–06(a)(2) (Lexis 2006); Md. Crim. Law Code Ann. §§3–303(d)(2),(3) (Lexis Supp. 2009) |
| Michigan | Mich. Comp. Laws Ann. §712A.4 (West 2002); §750.520b(2)(c) (West Supp. 2009); §769.1 (West 2000) |
| Minnesota | Minn. Stat. §§260B.125(1), 609.3455(2) (2008) |
| Mississippi | Miss. Code Ann. §43–21–157 (2009); §§97–3–53, |

99–19–81 (2007); §99–19–83 (2006)

| | |
|---|---|
| Missouri | Mo. Rev. Stat. §§211.071, 558.018 (2000) |
| Nebraska | Neb. Rev. Stat. §§28–105, 28–416(8)(a), 29–2204(1), (3), 43–247, 43–276 (2008) |
| Nevada | Nev. Rev. Stat. §§62B.330, 200.366 (2009) |
| New Hampshire | N. H. Rev. Stat. Ann. §169–B:24; §628:1 (2007); §§632–A:2, 651:6 (Supp. 2009) |
| New York | N. Y. Penal Law Ann. §§30.00, §60.06 (West 2009); §490.55 (West 2008) |
| North Carolina | N. C. Gen. Stat. Ann. §§7B–2200, 15A–1340.16B(a) (Lexis 2009) |
| North Dakota | N. D. Cent. Code Ann. §12.1–04–01 (Lexis 1997); §12.1–20–03 (Lexis Supp. 2009); §12.1–32–01 (Lexis 1997) |
| Ohio | Ohio Rev. Code Ann. §2152.10 (Lexis 2007); §2907.02 (Lexis 2006); §2971.03(A)(2) (2010 Lexis Supp. Pamphlet) |
| Oklahoma | Okla. Stat., Tit. 10A, §§2–5–204, 2–5–205, 2–5–206 (2009 West Supp.); *id.*, Tit. 21, §1115 (2007 West Supp.) |
| Oregon | Ore. Rev. Stat. §§137.707, 137.719(1) (2009) |
| Pennsylvania | 42 Pa. Cons. Stat. §6355(a) (2000); 18 *id.,* §3121(e)(2) (2008); 61 *id.,* §6137(a) (2009) |
| Rhode Island | R. I. Gen. Laws §§14–1–7, 14–1–7.1, 11–47–3.2 (Lexis 2002) |
| South Carolina | S. C. Code Ann. §63–19–1210 (2008 Supp. Pamphlet); §16–11–311(B) (Westlaw 2009) |
| South Dakota | S. D. Codified Laws §26–11–3.1 (Supp. 2009); §26–11–4 (2004); §§22–3–1, 22–6–1(2),(3) (2006); §24–15–4 (2004); §§22–19–1, 22–22–1 (2006) |
| Tennessee | Tenn. Code Ann. §§37–1–134, 40–35–120(g) (Westlaw 2010) |
| Utah | Utah Code Ann. §§78A–6–602, 78A–6–703, 76–5–302 (Lexis 2008) |
| Virginia | Va. Code Ann. §§16.1–269.1, §18.2–61, §53.1–151(B1) (2009) |
| Washington | Wash. Rev. Code §13.40.110 (2009 Supp.); §§9A.04.050, 9.94A.030(34), 9.94A.570 (2008) |
| West Virginia | W. Va. Code Ann. §49–5–10 (Lexis 2009); §61–2–14a(a) (Lexis 2005) |

Appendix to opinion of the Court

| Wisconsin | Wis. Stat. §§938.18, 938.183 (2007–2008); §939.62(2m)(c) (Westlaw 2005) |
|---|---|
| Wyoming | Wyo. Stat. Ann. §§6–2–306(d),(e), 14–6–203 (2009) |
| Federal | 18 U. S. C. §2241 (2006 ed. and Supp. II); §5032 (2006 ed.) |

## II. JURISDICTIONS THAT PERMIT LIFE WITHOUT PAROLE FOR JUVENILE OFFENDERS CONVICTED OF HOMICIDE CRIMES ONLY

| Connecticut | Conn. Gen. Stat. §53a–35a (2009) |
|---|---|
| Hawaii | Haw. Rev. Stat. §571–22(d) (2006); §706–656(1) (2008 Supp. Pamphlet) |
| Maine | Me. Rev. Stat. Ann., Tit. 15, §3101(4) (Supp. 2009); *id.*, Tit. 17–a, §1251 (2006) |
| Massachusetts | Mass Gen. Laws ch. 119, §74; *id.*, ch. 265, §2 (2008) |
| New Jersey | N. J. Stat. Ann. §2A:4A–26 (West Supp. 2009); §2C:11–3(b)(2) (West Supp. 2009) |
| New Mexico | N. M. Stat. Ann. §31–18–14 (Supp. 2009); §31–18–15.2(A) (Westlaw 2010) |
| Vermont | Vt. Stat. Ann., Tit. 33, §5204 (2009 Cum. Supp.); *id.*, Tit. 13, §2303 (2009) |

## III. JURISDICTIONS THAT FORBID LIFE WITHOUT PAROLE FOR JUVENILE OFFENDERS

| Alaska | Alaska Stat. §12.55.015(g) (2008) |
|---|---|
| Colorado | Colo. Rev. Stat. Ann. §18–1.3–401(4)(b) (2009) |
| Montana | Mont. Code Ann. §46–18–222(1) (2009) |
| Kansas | Kan. Stat. Ann. §21–4622 (West 2007) |
| Kentucky | Ky. Rev. Stat. Ann. §640.040 (West 2008); *Shepherd* v. *Commonwealth*, 251 S. W. 3d 309, 320–321 (Ky. 2008) |
| Texas | Tex. Penal Code Ann. §12.31 (West Supp. 2009) |

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–7412

_____

## TERRANCE JAMAR GRAHAM, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF APPEAL
OF FLORIDA, FIRST DISTRICT

[May 17, 2010]

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, concurring.

In his dissenting opinion, JUSTICE THOMAS argues that today's holding is not entirely consistent with the controlling opinions in *Lockyer* v. *Andrade*, 538 U. S. 63 (2003), *Ewing* v. *California*, 538 U. S. 11 (2003), *Harmelin* v. *Michigan*, 501 U. S. 957 (1991), and *Rummel* v. *Estelle*, 445 U. S. 263 (1980). *Post*, at 7–9. Given that "evolving standards of decency" have played a central role in our Eighth Amendment jurisprudence for at least a century, see *Weems* v. *United States*, 217 U. S. 349, 373–378 (1910), this argument suggests the dissenting opinions in those cases more accurately describe the law today than does JUSTICE THOMAS' rigid interpretation of the Amendment. Society changes. Knowledge accumulates. We learn, sometimes, from our mistakes. Punishments that did not seem cruel and unusual at one time may, in the light of reason and experience, be found cruel and unusual at a later time; unless we are to abandon the moral commitment embodied in the Eighth Amendment, proportionality review must never become effectively obsolete, *post*, at 8–9, and n. 2.

While JUSTICE THOMAS would apparently not rule out a death sentence for a $50 theft by a 7-year-old, see *post*, at 4, 10, n. 3, the Court wisely rejects his static approach to

the law. Standards of decency have evolved since 1980. They will never stop doing so.

# SUPREME COURT OF THE UNITED STATES

No. 08–7412

## TERRANCE JAMAR GRAHAM, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF APPEAL OF FLORIDA, FIRST DISTRICT

[May 17, 2010]

CHIEF JUSTICE ROBERTS, concurring in the judgment.

I agree with the Court that Terrance Graham's sentence of life without parole violates the Eighth Amendment's prohibition on "cruel and unusual punishments." Unlike the majority, however, I see no need to invent a new constitutional rule of dubious provenance in reaching that conclusion. Instead, my analysis is based on an application of this Court's precedents, in particular (1) our cases requiring "narrow proportionality" review of noncapital sentences and (2) our conclusion in *Roper* v. *Simmons*, 543 U. S. 551 (2005), that juvenile offenders are generally less culpable than adults who commit the same crimes.

These cases expressly allow courts addressing allegations that a noncapital sentence violates the Eighth Amendment to consider the particular defendant and particular crime at issue. The standards for relief under these precedents are rigorous, and should be. But here Graham's juvenile status—together with the nature of his criminal conduct and the extraordinarily severe punishment imposed—lead me to conclude that his sentence of life without parole is unconstitutional.

I

Our Court has struggled with whether and how to apply the Cruel and Unusual Punishments Clause to sentences

for noncapital crimes. Some of my colleagues have raised serious and thoughtful questions about whether, as an original matter, the Constitution was understood to require any degree of proportionality between noncapital offenses and their corresponding punishments. See, *e.g.*, *Harmelin* v. *Michigan*, 501 U. S. 957, 962–994 (1991) (principal opinion of SCALIA, J.); *post*, at 3–5, and n. 1 (THOMAS, J., dissenting). Neither party here asks us to reexamine our precedents requiring such proportionality, however, and so I approach this case by trying to apply our past decisions to the facts at hand.

A

Graham's case arises at the intersection of two lines of Eighth Amendment precedent. The first consists of decisions holding that the Cruel and Unusual Punishments Clause embraces a "narrow proportionality principle" that we apply, on a case-by-case basis, when asked to review noncapital sentences. *Lockyer* v. *Andrade*, 538 U. S. 63, 72 (2003) (internal quotation marks omitted); *Solem* v. *Helm*, 463 U. S. 277, 290 (1983); *Ewing* v. *California*, 538 U. S. 11, 20 (2003) (plurality opinion); *Harmelin*, *supra*, at 996–997 (KENNEDY, J., concurring in part and concurring in judgment). This "narrow proportionality principle" does not grant judges blanket authority to second-guess decisions made by legislatures or sentencing courts. On the contrary, a reviewing court will only "rarely" need "to engage in extended analysis to determine that a sentence is *not* constitutionally disproportionate," *Solem*, *supra*, at 290, n. 16 (emphasis added), and "successful challenges" to noncapital sentences will be all the more "exceedingly rare," *Rummel* v. *Estelle*, 445 U. S. 263, 272 (1980).

We have "not established a clear or consistent path for courts to follow" in applying the highly deferential "narrow proportionality" analysis. *Lockyer*, *supra*, at 72. We have, however, emphasized the primacy of the legislature in

setting sentences, the variety of legitimate penological schemes, the state-by-state diversity protected by our federal system, and the requirement that review be guided by objective, rather than subjective, factors. *Ewing*, *supra*, at 23 (plurality opinion); *Harmelin*, *supra*, at 998–1001 (opinion of KENNEDY, J.). Most importantly, however, we have explained that the Eighth Amendment "'does not require strict proportionality between crime and sentence'"; rather, "'it forbids only extreme sentences that are "grossly disproportionate" to the crime.'" *Ewing*, *supra*, at 23 (plurality opinion) (quoting *Harmelin*, *supra*, at 1001 (opinion of KENNEDY, J.)).

Our cases indicate that courts conducting "narrow proportionality" review should begin with a threshold inquiry that compares "the gravity of the offense and the harshness of the penalty." *Solem*, 463 U. S., at 290–291. This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history. *Id.*, at 292–294, 296–297, and n. 22 (considering motive, past criminal conduct, alcoholism, and propensity for violence of the particular defendant); see also *Ewing*, *supra*, at 28–30 (plurality opinion) (examining defendant's criminal history); *Harmelin*, 501 U. S., at 1001–1004 (opinion of KENNEDY, J.) (noting specific details of the particular crime of conviction).

Only in "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," *id.*, at 1005, should courts proceed to an "intrajurisdictional" comparison of the sentence at issue with those imposed on other criminals in the same jurisdiction, and an "interjurisdictional" comparison with sentences imposed for the same crime in other jurisdictions. *Solem*, *supra*, at 291–292. If these subsequent comparisons confirm the inference of gross disproportionality, courts should invalidate the

sentence as a violation of the Eighth Amendment.

## B

The second line of precedent relevant to assessing Graham's sentence consists of our cases acknowledging that juvenile offenders are *generally*—though not necessarily in every case—less morally culpable than adults who commit the same crimes. This insight animated our decision in *Thompson* v. *Oklahoma*, 487 U. S. 815 (1988), in which we invalidated a capital sentence imposed on a juvenile who had committed his crime under the age of 16. More recently, in *Roper,* 543 U. S. 551, we extended the prohibition on executions to those who committed their crimes before the age of 18.

Both *Thompson* and *Roper* arose in the unique context of the death penalty, a punishment that our Court has recognized "must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" 543 U. S., at 568 (quoting *Atkins* v. *Virginia*, 536 U. S. 304, 319 (2002)). *Roper*'s prohibition on the juvenile death penalty followed from our conclusion that "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." 543 U. S., at 569. These differences are a lack of maturity and an underdeveloped sense of responsibility, a heightened susceptibility to negative influences and outside pressures, and the fact that the character of a juvenile is "more transitory" and "less fixed" than that of an adult. *Id.*, at 569–570. Together, these factors establish the "diminished culpability of juveniles," *id.*, at 571, and "render suspect any conclusion" that juveniles are among "the worst offenders" for whom the death penalty is reserved, *id.*, at 570.

Today, the Court views *Roper* as providing the basis for

a new categorical rule that juveniles may never receive a sentence of life without parole for nonhomicide crimes. I disagree. In *Roper*, the Court tailored its analysis of juvenile characteristics to the specific question whether juvenile offenders could constitutionally be subject to capital punishment. Our answer that they could not be sentenced to death was based on the explicit conclusion that they "cannot with reliability be classified among the *worst* offenders." *Id.*, at 569 (emphasis added).

This conclusion does not establish that juveniles can never be eligible for life without parole. A life sentence is of course far less severe than a death sentence, and we have never required that it be imposed only on the very worst offenders, as we have with capital punishment. Treating juvenile life sentences as analogous to capital punishment is at odds with our longstanding view that "the death penalty is different from other punishments in kind rather than degree." *Solem, supra*, at 294. It is also at odds with *Roper* itself, which drew the line at capital punishment by blessing juvenile sentences that are "less severe than death" despite involving "forfeiture of some of the most basic liberties." 543 U. S., at 573–574. Indeed, *Roper* explicitly relied on the possible imposition of life without parole on some juvenile offenders. *Id.*, at 572.

But the fact that *Roper* does not support a categorical rule barring life sentences for all juveniles does not mean that a criminal defendant's age is irrelevant to those sentences. On the contrary, our cases establish that the "narrow proportionality" review applicable to noncapital cases itself takes the personal "culpability of the offender" into account in examining whether a given punishment is proportionate to the crime. *Solem, supra*, at 292. There is no reason why an offender's juvenile status should be excluded from the analysis. Indeed, given *Roper*'s conclusion that juveniles are typically less blameworthy than adults, 543 U. S., at 571, an offender's juvenile status can

play a central role in the inquiry.

JUSTICE THOMAS disagrees with even our limited reliance on *Roper* on the ground that the present case does not involve capital punishment. *Post*, at 26 (dissenting opinion). That distinction is important—indeed, it underlies our rejection of the categorical rule declared by the Court. But *Roper*'s conclusion that juveniles are typically less culpable than adults has pertinence beyond capital cases, and rightly informs the case-specific inquiry I believe to be appropriate here.

In short, our existing precedent already provides a sufficient framework for assessing the concerns outlined by the majority. Not every juvenile receiving a life sentence will prevail under this approach. Not every juvenile should. But all will receive the protection that the Eighth Amendment requires.

## II

Applying the "narrow proportionality" framework to the particular facts of this case, I conclude that Graham's sentence of life without parole violates the Eighth Amendment.*

––––––––––

*JUSTICE ALITO suggests that Graham has failed to preserve any challenge to his sentence based on the "narrow, as-applied proportionality principle." *Post*, at 1 (dissenting opinion). I disagree. It is true that Graham asks us to declare, categorically, that no juvenile convicted of a nonhomicide offense may ever be subject to a sentence of life without parole. But he claims that this rule is warranted under the narrow proportionality principle we set forth in *Solem* v. *Helm,* 463 U. S. 277 (1983), *Harmelin* v. *Michigan,* 501 U. S. 957 (1991), and *Ewing* v. *California*, 538 U. S. 11 (2003). Brief for Petitioner 30, 31, 54–64. Insofar as he relies on that framework, I believe we may do so as well, even if our analysis results in a narrower holding than the categorical rule Graham seeks. See also Reply Brief for Petitioner 15, n. 8 ("[T]he Court could rule narrowly in this case and hold only that petitioner's sentence of life without parole was unconstitutionally disproportionate").

## A

I begin with the threshold inquiry comparing the gravity of Graham's conduct to the harshness of his penalty. There is no question that the crime for which Graham received his life sentence—armed burglary of a nondomicil with an assault or battery—is "a serious crime deserving serious punishment." *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982). So too is the home invasion robbery that was the basis of Graham's probation violation. But these crimes are certainly less serious than other crimes, such as murder or rape.

As for Graham's degree of personal culpability, he committed the relevant offenses when he was a juvenile—a stage at which, *Roper* emphasized, one's "culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." 543 U. S., at 571. Graham's age places him in a significantly different category from the defendants in *Rummel*, *Harmelin*, and *Ewing*, all of whom committed their crimes as adults. Graham's youth made him relatively more likely to engage in reckless and dangerous criminal activity than an adult; it also likely enhanced his susceptibility to peer pressure. See, *e.g.*, *Roper*, *supra*, at 569; *Johnson* v. *Texas*, 509 U. S. 350, 367 (1993); *Eddings* v. *Oklahoma*, 455 U. S. 104, 115–117 (1982). There is no reason to believe that Graham should be denied the general presumption of diminished culpability that *Roper* indicates should apply to juvenile offenders. If anything, Graham's in-court statements—including his request for a second chance so that he could "do whatever it takes to get to the NFL"—underscore his immaturity. App. 380.

The fact that Graham committed the crimes that he did proves that he was dangerous and deserved to be punished. But it does not establish that he was *particularly* dangerous—at least relative to the murderers and rapists for whom the sentence of life without parole is typically

reserved.  On the contrary, his lack of prior criminal convictions, his youth and immaturity, and the difficult circumstances of his upbringing noted by the majority, *ante*, at 1, all suggest that he was markedly less culpable than a typical adult who commits the same offenses.

Despite these considerations, the trial court sentenced Graham to life in prison without the possibility of parole. This is the second-harshest sentence available under our precedents for *any* crime, and the most severe sanction available for a nonhomicide offense.  See *Kennedy* v. *Louisiana*, 554 U. S. ___ (2008).  Indeed, as the majority notes, Graham's sentence far exceeded the punishment proposed by the Florida Department of Corrections  (which suggested a sentence of four years, Brief for Petitioner 20), and the state prosecutors (who asked that he be sentenced to 30 years in prison for the armed burglary, App. 388). No one in Graham's case other than the sentencing judge appears to have believed that Graham deserved to go to prison for life.

Based on the foregoing circumstances, I conclude that there is a strong inference that Graham's sentence of life imprisonment without parole was grossly disproportionate in violation of the Eighth Amendment.  I therefore proceed to the next steps of the proportionality analysis.

## B

Both intrajurisdictional and interjurisdictional comparisons of Graham's sentence confirm the threshold inference of disproportionality.

Graham's sentence was far more severe than that imposed for similar violations of Florida law, even without taking juvenile status into account.  For example, individuals who commit burglary or robbery offenses in Florida receive average sentences of less than 5 years and less than 10 years, respectively.  Florida Dept. of Corrections, Annual Report FY 2007–2008: The Guidebook to Correc-

tions in Florida 35. Unsurprisingly, Florida's juvenile criminals receive similarly low sentences—typically less than five years for burglary and less than seven years for robbery. *Id.*, at 36. Graham's life without parole sentence was far more severe than the average sentence imposed on those convicted of murder or manslaughter, who typically receive under 25 years in prison. *Id.*, at 35. As the Court explained in *Solem*, 463 U. S., at 291, "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive."

Finally, the inference that Graham's sentence is disproportionate is further validated by comparison to the sentences imposed in other domestic jurisdictions. As the majority opinion explains, Florida is an outlier in its willingness to impose sentences of life without parole on juveniles convicted of nonhomicide crimes. See *ante*, at 11–13.

### III

So much for Graham. But what about Milagro Cunningham, a 17-year-old who beat and raped an 8-year-old girl before leaving her to die under 197 pounds of rock in a recycling bin in a remote landfill? See Musgrave, Cruel or Necessary? Life Terms for Youths Spur National Debate, Palm Beach Post, Oct. 15, 2009, p. 1A. Or Nathan Walker and Jakaris Taylor, the Florida juveniles who together with their friends gang-raped a woman and forced her to perform oral sex on her 12-year-old son? See 3 Sentenced to Life for Gang Rape of Mother, Associated Press, Oct. 14, 2009. The fact that Graham cannot be sentenced to life without parole for his conduct says nothing whatever about these offenders, or others like them who commit nonhomicide crimes far more reprehensible than the conduct at issue here. The Court uses Graham's case as a vehicle to proclaim a new constitutional rule—applicable well beyond the particular facts of Graham's case—that a

sentence of life without parole imposed on *any* juvenile for *any* nonhomicide offense is unconstitutional. This categorical conclusion is as unnecessary as it is unwise.

A holding this broad is unnecessary because the particular conduct and circumstances at issue in the case before us are not serious enough to justify Graham's sentence. In reaching this conclusion, there is no need for the Court to decide whether that same sentence would be constitutional if imposed for other more heinous nonhomicide crimes.

A more restrained approach is especially appropriate in light of the Court's apparent recognition that it is perfectly legitimate for a juvenile to receive a sentence of life without parole for committing murder. This means that there is nothing *inherently* unconstitutional about imposing sentences of life without parole on juvenile offenders; rather, the constitutionality of such sentences depends on the particular crimes for which they are imposed. But if the constitutionality of the sentence turns on the particular crime being punished, then the Court should limit its holding to the particular offenses that Graham committed here, and should decline to consider other hypothetical crimes not presented by this case.

In any event, the Court's categorical conclusion is also unwise. Most importantly, it ignores the fact that some nonhomicide crimes—like the ones committed by Milagro Cunningham, Nathan Walker, and Jakaris Taylor—are especially heinous or grotesque, and thus may be deserving of more severe punishment.

Those under 18 years old may as a general matter have "diminished" culpability relative to adults who commit the same crimes, *Roper*, 543 U. S., at 571, but that does not mean that their culpability is always insufficient to justify a life sentence. See generally *Thompson*, 487 U. S., at 853 (O'Connor, J., concurring in judgment). It does not take a moral sense that is fully developed in every respect to

know that beating and raping an 8-year-old girl and leaving her to die under 197 pounds of rocks is horribly wrong. The single fact of being 17 years old would not afford Cunningham protection against life without parole if the young girl had died—as Cunningham surely expected she would—so why should it do so when she miraculously survived his barbaric brutality?

The Court defends its categorical approach on the grounds that a "clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Ante*, at 24. It argues that a case-by-case approach to proportionality review is constitutionally insufficient because courts might not be able "with sufficient accuracy [to] distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." *Ante,* at 27.

The Court is of course correct that judges will never have perfect foresight—or perfect wisdom—in making sentencing decisions. But this is true when they sentence adults no less than when they sentence juveniles. It is also true when they sentence juveniles who commit murder no less than when they sentence juveniles who commit other crimes.

Our system depends upon sentencing judges applying their reasoned judgment to each case that comes before them. As we explained in *Solem*, the whole enterprise of proportionality review is premised on the "justified" assumption that "courts are competent to judge the gravity of an offense, at least on a relative scale." 463 U. S., at 292. Indeed, "courts traditionally have made these judgments" by applying "generally accepted criteria" to analyze "the harm caused or threatened to the victim or society, and the culpability of the offender." *Id.*, at 292, 294.

\*     \*     \*

Terrance Graham committed serious offenses, for which he deserves serious punishment.  But he was only 16 years old, and under our Court's precedents, his youth is one factor, among others, that should be considered in deciding whether his punishment was unconstitutionally excessive.  In my view, Graham's age—together with the nature of his criminal activity and the unusual severity of his sentence—tips the constitutional balance.  I thus concur in the Court's judgment that Graham's sentence of life without parole violated the Eighth Amendment.

I would not, however, reach the same conclusion in every case involving a juvenile offender.  Some crimes are so heinous, and some juvenile offenders so highly culpable, that a sentence of life without parole may be entirely justified under the Constitution.  As we have said, "successful challenges" to noncapital sentences under the Eighth Amendment have been—and, in my view, should continue to be—"exceedingly rare." *Rummel*, 445 U. S., at 272.  But Graham's sentence presents the exceptional case that our precedents have recognized will come along.  We should grant Graham the relief to which he is entitled under the Eighth Amendment.  The Court errs, however, in using this case as a vehicle for unsettling our established jurisprudence and fashioning a categorical rule applicable to far different cases.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–7412

———————

## TERRANCE JAMAR GRAHAM, PETITIONER *v.* FLORIDA

### ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF APPEAL OF FLORIDA, FIRST DISTRICT

[May 17, 2010; modified July 6, 2010]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, and with whom JUSTICE ALITO joins as to Parts I and III, dissenting.

The Court holds today that it is "grossly disproportionate" and hence unconstitutional for any judge or jury to impose a sentence of life without parole on an offender less than 18 years old, unless he has committed a homicide. Although the text of the Constitution is silent regarding the permissibility of this sentencing practice, and although it would not have offended the standards that prevailed at the founding, the Court insists that the standards of American society have evolved such that the Constitution now requires its prohibition.

The news of this evolution will, I think, come as a surprise to the American people. Congress, the District of Columbia, and 37 States allow judges and juries to consider this sentencing practice in juvenile nonhomicide cases, and those judges and juries have decided to use it in the very worst cases they have encountered.

The Court does not conclude that life without parole itself is a cruel and unusual punishment. It instead rejects the judgments of those legislatures, judges, and juries regarding what the Court describes as the "moral" question of whether this sentence can ever be "proportionat[e]" when applied to the category of offenders at

issue here. *Ante*, at 7 (internal quotation marks omitted), *ante*, at 1 (STEVENS, J., concurring).

I am unwilling to assume that we, as members of this Court, are any more capable of making such moral judgments than our fellow citizens. Nothing in our training as judges qualifies us for that task, and nothing in Article III gives us that authority.

I respectfully dissent.

I

The Court recounts the facts of Terrance Jamar Graham's case in detail, so only a summary is necessary here. At age 16 years and 6 months, Graham and two masked accomplices committed a burglary at a small Florida restaurant, during which one of Graham's accomplices twice struck the restaurant manager on the head with a steel pipe when he refused to turn over money to the intruders. Graham was arrested and charged as an adult. He later pleaded guilty to two offenses, including armed burglary with assault or battery, an offense punishable by life imprisonment under Florida law. Fla. Stat. §§810.02(2)(a), 810.02(2)(b) (2007). The trial court withheld adjudication on both counts, however, and sentenced Graham to probation, the first 12 months of which he spent in a county detention facility.

Graham reoffended just six months after his release. At a probation revocation hearing, a judge found by a preponderance of the evidence that, at age 17 years and 11 months, Graham invaded a home with two accomplices and held the homeowner at gunpoint for approximately 30 minutes while his accomplices ransacked the residence. As a result, the judge concluded that Graham had violated his probation and, after additional hearings, adjudicated Graham guilty on both counts arising from the restaurant robbery. The judge imposed the maximum sentence allowed by Florida law on the armed burglary count, life

imprisonment without the possibility of parole.

Graham argues, and the Court holds, that this sentence violates the Eighth Amendment's Cruel and Unusual Punishments Clause because a life-without-parole sentence is always "grossly disproportionate" when imposed on a person under 18 who commits any crime short of a homicide. Brief for Petitioner 24; *ante*, at 21.

## II

### A

The Eighth Amendment, which applies to the States through the Fourteenth, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It is by now well established that the Cruel and Unusual Punishments Clause was originally understood as prohibiting torturous "'*methods* of punishment,'" *Harmelin* v. *Michigan*, 501 U. S. 957, 979 (1991) (opinion of SCALIA, J.) (quoting Granucci, "Nor Cruel and Unusual Punishments Inflicted": The Original Meaning, 57 Cal. L. Rev. 839, 842 (1969))—specifically methods akin to those that had been considered cruel and unusual at the time the Bill of Rights was adopted, *Baze* v. *Rees*, 553 U. S. 35, 99 (2008) (THOMAS, J., concurring in judgment). With one arguable exception, see *Weems* v. *United States*, 217 U. S. 349 (1910); *Harmelin, supra*, at 990–994 (opinion of SCALIA, J.) (discussing the scope and relevance of *Weems'* holding), this Court applied the Clause with that understanding for nearly 170 years after the Eighth Amendment's ratification.

More recently, however, the Court has held that the Clause authorizes it to proscribe not only methods of punishment that qualify as "cruel and unusual," but also any punishment that the Court deems "grossly disproportionate" to the crime committed. *Ante*, at 8 (internal quotation marks omitted). This latter interpretation is

entirely the Court's creation. As has been described else-
where at length, there is virtually no indication that the
Cruel and Unusual Punishments Clause originally was
understood to require proportionality in sentencing. See
*Harmelin*, 501 U. S., at 975–985 (opinion of SCALIA, J.).
Here, it suffices to recall just two points. First, the Clause
does not expressly refer to proportionality or invoke any
synonym for that term, even though the Framers were
familiar with the concept, as evidenced by several found-
ing-era state constitutions that required (albeit without
defining) proportional punishments. See *id.*, at 977–978.
In addition, the penal statute adopted by the First Con-
gress demonstrates that proportionality in sentencing was
not considered a constitutional command.[1] See *id.*, at
980–981 (noting that the statute prescribed capital pun-
ishment for offenses ranging from "'run[ning] away with
. . . goods or merchandise to the value of fifty dollars,'" to
"murder on the high seas" (quoting 1 Stat. 114)); see also
Preyer, Penal Measures in the American Colonies: An
Overview, 26 Am. J. Legal Hist. 326, 348–349, 353 (1982)
(explaining that crimes in the late 18th-century colonies

--------

[1] THE CHIEF JUSTICE's concurrence suggests that it is unnecessary to
remark on the underlying question whether the Eighth Amendment
requires proportionality in sentencing because "[n]either party here
asks us to reexamine our precedents" requiring "proportionality be-
tween noncapital offenses and their corresponding punishments." *Ante*,
at 2 (opinion concurring in judgment). I disagree. Both the Court and
the concurrence do more than apply existing noncapital proportionality
precedents to the particulars of Graham's claim. The Court radically
departs from the framework those precedents establish by applying to a
noncapital sentence the categorical proportionality review its prior
decisions have reserved for death penalty cases alone. See Part III,
*infra*. The concurrence, meanwhile, breathes new life into the case-by-
case proportionality approach that previously governed noncapital
cases, from which the Court has steadily, and wisely, retreated since
*Solem* v. *Helm*, 463 U. S. 277 (1983). See Part IV, *infra*. In dissenting
from both choices to expand proportionality review, I find it essential to
reexamine the foundations on which that doctrine is built.

generally were punished either by fines, whipping, or public "shaming," or by death, as intermediate sentencing options such as incarceration were not common).

The Court has nonetheless invoked proportionality to declare that capital punishment—though not unconstitutional *per se*—is categorically too harsh a penalty to apply to certain types of crimes and certain classes of offenders. See *Coker* v. *Georgia*, 433 U. S. 584 (1977) (plurality opinion) (rape of an adult woman); *Kennedy* v. *Louisiana*, 554 U. S. \_\_\_ (2008) (rape of a child); *Enmund* v. *Florida*, 458 U. S. 782 (1982) (felony murder in which the defendant participated in the felony but did not kill or intend to kill); *Thompson* v. *Oklahoma*, 487 U. S. 815 (1988) (plurality opinion) (juveniles under 16); *Roper* v. *Simmons*, 543 U. S. 551 (2005) (juveniles under 18); *Atkins* v. *Virginia*, 536 U. S. 304 (2002) (mentally retarded offenders). In adopting these categorical proportionality rules, the Court intrudes upon areas that the Constitution reserves to other (state and federal) organs of government. The Eighth Amendment prohibits the government from inflicting a cruel and unusual method of punishment upon a defendant. Other constitutional provisions ensure the defendant's right to fair process before any punishment is imposed. But, as members of today's majority note, "[s]ociety changes," *ante*, at 1 (STEVENS, J., concurring), and the Eighth Amendment leaves the unavoidably moral question of who "deserves" a particular nonprohibited method of punishment to the judgment of the legislatures that authorize the penalty, the prosecutors who seek it, and the judges and juries that impose it under circumstances they deem appropriate.

The Court has nonetheless adopted categorical rules that shield entire classes of offenses and offenders from the death penalty on the theory that "evolving standards of decency" require this result. *Ante*, at 7 (internal quotation marks omitted). The Court has offered assurances that these standards can be reliably measured by "'objec-

tive indicia'" of "national consensus," such as state and
federal legislation, jury behavior, and (surprisingly, given
that we are talking about "national" consensus) interna-
tional opinion. *Ante*, at 10 (quoting *Roper, supra*, at 563);
see also *ante*, at 10–16, 29–31. Yet even assuming that is
true, the Framers did not provide for the constitutionality
of a particular type of punishment to turn on a "snapshot
of American public opinion" taken at the moment a case
is decided. *Roper, supra*, at 629 (SCALIA, J., dissenting).
By holding otherwise, the Court pretermits in all but one
direction the evolution of the standards it describes, thus
"calling a constitutional halt to what may well be a pen-
dulum swing in social attitudes," *Thompson, supra*, at
869 (SCALIA, J., dissenting), and "stunt[ing] legislative
consideration" of new questions of penal policy as they
emerge, *Kennedy, supra*, at ___ (slip op., at 2) (ALITO, J.,
dissenting).

But the Court is not content to rely on snapshots of
community consensus in any event. *Ante*, at 16 ("Commu-
nity consensus, while 'entitled to great weight,' is not itself
determinative" (quoting *Kennedy, supra*, at __ (slip op., at
24))). Instead, it reserves the right to reject the evidence
of consensus it finds whenever its own "independent judg-
ment" points in a different direction. *Ante,* at 16. The
Court thus openly claims the power not only to approve or
disapprove of democratic choices in penal policy based on
evidence of how society's standards *have* evolved, but also
on the basis of the Court's "independent" perception of
how those standards *should* evolve, which depends on
what the Court concedes is "'"necessarily . . . a moral
judgment"'" regarding the propriety of a given punish-
ment in today's society. *Ante*, at 7 (quoting *Kennedy,
supra*, at ___ (slip op., at 8)).

The categorical proportionality review the Court em-
ploys in capital cases thus lacks a principled foundation.
The Court's decision today is significant because it does

not merely apply this standard—it remarkably expands its reach. For the first time in its history, the Court declares an entire class of offenders immune from a noncapital sentence using the categorical approach it previously reserved for death penalty cases alone.

### B

Until today, the Court has based its categorical proportionality rulings on the notion that the Constitution gives special protection to capital defendants because the death penalty is a uniquely severe punishment that must be reserved for only those who are "most deserving of execution." *Atkins*, *supra*, at 319; see *Roper*, *supra*, at 568; *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Lockett* v. *Ohio*, 438 U. S. 586 (1978). Of course, the Eighth Amendment itself makes no distinction between capital and noncapital sentencing, but the "'bright line'" the Court drew between the two penalties has for many years served as the principal justification for the Court's willingness to reject democratic choices regarding the death penalty. See *Rummel* v. *Estelle*, 445 U. S. 263, 275 (1980).

Today's decision eviscerates that distinction. "Death is different" no longer. The Court now claims not only the power categorically to reserve the "most severe punishment" for those the Court thinks are "'the most deserving of execution,'" *Roper,* 543 U. S., at 568 (quoting *Atkins,* 536 U. S., at 319), *but also* to declare that "less culpable" persons are categorically exempt from the "*second* most severe penalty." *Ante*, at 21 (emphasis added). No reliable limiting principle remains to prevent the Court from immunizing any class of offenders from the law's third, fourth, fifth, or fiftieth most severe penalties as well.

The Court's departure from the "death is different" distinction is especially mystifying when one considers how long it has resisted crossing that divide. Indeed, for a time the Court declined to apply proportionality principles

to noncapital sentences at all, emphasizing that "a sentence of death differs in kind from any sentence of imprisonment, *no matter how long.*" *Rummel*, 445 U. S., at 272 (emphasis added). Based on that rationale, the Court found that the excessiveness of one prison term as compared to another was "properly within the province of legislatures, not courts," *id.*, at 275–276, precisely because it involved an "*invariably . . . subjective determination*, there being no clear way to make 'any constitutional distinction between one term of years and a shorter or longer term of years,'" *Hutto* v. *Davis*, 454 U. S. 370, 373 (1982) *(per curiam)* (quoting *Rummel*, *supra*, at 275; emphasis added).

Even when the Court broke from that understanding in its 5-to-4 decision in *Solem* v. *Helm*, 463 U. S. 277 (1983) (striking down as "grossly disproportionate" a life-without-parole sentence imposed on a defendant for passing a worthless check), the Court did so only as applied to the facts of that case; it announced no categorical rule. *Id.,* at 288, 303. Moreover, the Court soon cabined *Solem*'s rationale. The controlling opinion in the Court's very next noncapital proportionality case emphasized that principles of federalism require substantial deference to legislative choices regarding the proper length of prison sentences. *Harmelin*, 501 U. S., at 999 (opinion of KENNEDY, J.) ("[M]arked divergences both in underlying theories of sentencing and in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure"); *id.*, at 1000 ("[D]iffering attitudes and perceptions of local conditions may yield different, yet rational, conclusions regarding the appropriate length of prison terms for particular crimes"). That opinion thus concluded that "*successful* challenges to the proportionality of [prison] sentences [would be] exceedingly rare." *Id.*, at 1001 (internal quotation marks omitted).

They have been rare indeed. In the 28 years since

*Solem*, the Court has considered just three such challenges and has rejected them all, see *Ewing* v. *California*, 538 U. S. 11 (2003); *Lockyer* v. *Andrade*, 538 U. S. 63 (2003); *Harmelin*, *supra*, largely on the theory that criticisms of the "wisdom, cost-efficiency, and effectiveness" of term-of-years prison sentences are "appropriately directed at the legislature[s]," not the courts, *Ewing*, *supra,* at 27, 28 (plurality opinion). The Court correctly notes that those decisions were "closely divided," *ante*, at 8, but so was *Solem* itself, and it is now fair to describe *Solem* as an outlier.[2]

Remarkably, the Court today does more than return to *Solem*'s case-by-case proportionality standard for noncapital sentences; it hurtles past it to impose a *categorical* proportionality rule banning life-without-parole sentences not just in this case, but in *every* case involving a juvenile nonhomicide offender, no matter what the circumstances. Neither the Eighth Amendment nor the Court's precedents justify this decision.

## III

The Court asserts that categorical proportionality review is necessary here merely because Graham asks for a categorical rule, see *ante*, at 10, and because the Court

---

[2] Courts and commentators interpreting this Court's decisions have reached this conclusion. See, *e.g.*, *United States* v. *Polk*, 546 F. 3d 74, 76 (CA1 2008) ("[I]nstances of gross disproportionality [in noncapital cases] will be hen's-teeth rare"); Barkow, The Court of Life and Death: The Two Tracks of Constitutional Sentencing Law and the Case for Uniformity, 107 Mich. L. Rev. 1145, 1160 (2009) ("*Solem* now stands as an outlier"); Note, The Capital Punishment Exception: A Case for Constitutionalizing the Substantive Criminal Law, 104 Colum. L. Rev. 426, 445 (2004) (observing that outside of the capital context, "proportionality review has been virtually dormant"); Steiker & Steiker, Opening a Window or Building a Wall? The Effect of Eighth Amendment Death Penalty Law and Advocacy on Criminal Justice More Broadly, 11 U. Pa. J. Const. L. 155, 184 (2009) ("Eighth Amendment challenges to excessive incarceration [are] essentially non-starters").

thinks clear lines are a good idea, see *ante*, at 25. I find those factors wholly insufficient to justify the Court's break from past practice. First, the Court fails to acknowledge that a petitioner seeking to exempt an entire category of offenders from a sentencing practice carries a much heavier burden than one seeking case-specific relief under *Solem*. Unlike the petitioner in *Solem*, Graham must establish not only that his own life-without-parole sentence is "grossly disproportionate," but also that such a sentence is always grossly disproportionate whenever it is applied to a juvenile nonhomicide offender, no matter how heinous his crime. Cf. *United States* v. *Salerno*, 481 U. S. 739 (1987). Second, even applying the Court's categorical "evolving standards" test, neither objective evidence of national consensus nor the notions of culpability on which the Court's "independent judgment" relies can justify the categorical rule it declares here.

## A

According to the Court, proper Eighth Amendment analysis "begins with objective indicia of national consensus,"[3] and "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures," *ante*, at 10–11 (internal quota-

---

[3] The Court ignores entirely the threshold inquiry of whether subjecting juvenile offenders to adult penalties was one of the "modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted." *Ford* v. *Wainwright*, 477 U. S. 399, 405 (1986). As the Court has noted in the past, however, the evidence is clear that, at the time of the Founding, "the common law set a rebuttable presumption of incapacity to commit any felony at the age of 14, and theoretically permitted [even] capital punishment to be imposed on a person as young as age 7." *Stanford* v. *Kentucky*, 492 U. S. 361, 368 (1989) (citing 4 W. Blackstone, Commentaries *23–*24; 1 M. Hale, Pleas of the Crown 24–29 (1800)). It thus seems exceedingly unlikely that the imposition of a life-without-parole sentence on a person of Graham's age would run afoul of those standards.

tion marks omitted). As such, the analysis should end quickly, because a national "consensus" in favor of the Court's result simply does not exist. The laws of all 50 States, the Federal Government, and the District of Columbia provide that juveniles over a certain age may be tried in adult court if charged with certain crimes.[4] See *ante*, at 33–35 (Appendix to opinion of the Court). Forty-five States, the Federal Government, and the District of Columbia expose juvenile offenders charged in adult court to the very same range of punishments faced by adults charged with the same crimes. See *ante*, at 33–34, Part I. Eight of those States do not make life-without-parole sentences available for any nonhomicide offender, regardless of age.[5] All remaining jurisdictions—the Federal Government, the other 37 States, and the District—authorize life-without-parole sentences for certain nonhomicide offenses, and authorize the imposition of such sentences on persons under 18. See *ibid*. Only *five* States

---

[4] Although the details of state laws vary extensively, they generally permit the transfer of a juvenile offender to adult court through one or more of the following mechanisms: (1) judicial waiver, in which the juvenile court has the authority to waive jurisdiction over the offender and transfer the case to adult court; (2) concurrent jurisdiction, in which adult and juvenile courts share jurisdiction over certain cases and the prosecutor has discretion to file in either court; or (3) statutory provisions that exclude juveniles who commit certain crimes from juvenile-court jurisdiction. See Dept. of Justice, Juvenile Offenders and Victims: 1999 National Report 89, 104 (1999) (hereinafter 1999 DOJ National Report); Feld, Unmitigated Punishment: Adolescent Criminal Responsibility and LWOP Sentences, 10 J. Law & Family Studies 11, 38–39 (2007).

[5] Alaska entitles all offenders to parole, regardless of their crime. Alaska Stat. §12.55.015(g) (2008). The other seven States provide parole eligibility to all offenders, except those who commit certain homicide crimes. Conn. Gen. Stat. §53a–35a (2009); Haw. Rev. Stat. §§706–656(1)–(2) (1993 and 2008 Supp. Pamphlet); Me. Rev. Stat. Ann., Tit. 17–a, §1251 (2006); Mass. Gen. Laws Ann., ch. 265, §2 (West 2008); N. J. Stat. Ann. §§2C:11–3(b)(2)–(3) (West 2005); N. M. Stat. Ann. §31–18–14 (Supp. 2009); Vt. Stat. Ann., Tit. 13, §2303 (2009).

prohibit juvenile offenders from receiving a life-without-parole sentence that could be imposed on an adult convicted of the same crime.[6]

No plausible claim of a consensus against this sentencing practice can be made in light of this overwhelming legislative evidence. The sole fact that federal law authorizes this practice singlehandedly refutes the claim that our Nation finds it morally repugnant. The additional reality that 37 out of 50 States (a supermajority of 74%) permit the practice makes the claim utterly implausible. Not only is there no consensus against this penalty, there is a clear legislative consensus *in favor* of its availability.

Undaunted, however, the Court brushes this evidence aside as "incomplete and unavailing," declaring that "'[t]here are measures of consensus other than legislation.'" *Ante*, at 11 (quoting *Kennedy*, 554 U. S., at ___ (slip op., at 22)). This is nothing short of stunning. Most importantly, federal civilian law approves this sentencing practice.[7] And although the Court has never decided how many state laws are necessary to show consensus, the Court has never banished into constitutional exile a sentencing practice that the laws of a majority, let alone a supermajority, of States expressly permit.[8]

———————

[6] Colo. Rev. Stat. Ann. §18–1.3–401(4)(b) (2009) (authorizing mandatory life sentence with possibility for parole after 40 years for juveniles convicted of class 1 felonies); Kan. Stat. Ann. §§21–4622, 4643 (2007); Ky. Rev. Stat. Ann. §640.040 (West 2006); *Shepherd* v. *Commonwealth*, 251 S. W. 3d 309, 320–321 (Ky. 2008); Mont. Code Ann. §46–18–222(1) (2009); Tex. Penal Code Ann. §12.31 (West Supp. 2009).

[7] Although the Court previously has dismissed the relevance of the Uniform Code of Military Justice to its discernment of consensus, see *Kennedy* v. *Louisiana*, 554 U. S. ___, ___ (2008) (statement of KENNEDY, J., respecting denial of rehearing), juveniles who enlist in the military are nonetheless eligible for life-without-parole sentences if they commit certain nonhomicide crimes. See 10 U. S. C. §§505(a) (permitting enlistment at age 17), 856a, 920 (2006 ed., Supp. II).

[8] *Kennedy*, 554 U. S., at ___ (slip op., at 12, 23) (prohibiting capital

Moreover, the consistency and direction of recent legislation—a factor the Court previously has relied upon when crafting categorical proportionality rules, see *Atkins*, 536 U. S., at 315–316; *Roper*, 543 U. S., at 565–566—underscores the consensus *against* the rule the Court announces here. In my view, the Court cannot point to a national consensus in favor of its rule without assuming a consensus in favor of the two penological points it later discusses: (1) Juveniles are always less culpable than similarly-situated adults, and (2) juveniles who commit nonhomicide crimes should always receive an opportunity to demonstrate rehabilitation through parole. *Ante*, at 17–18, 23–25. But legislative trends make that assumption untenable.

First, States over the past 20 years have consistently *increased* the severity of punishments for juvenile offenders. See 1999 DOJ National Report 89 (referring to the 1990's as "a time of unprecedented change as State legis-

─────────

punishment for the rape of a child where only six States had enacted statutes authorizing the punishment since *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*); *Roper* v. *Simmons*, 543 U. S. 551, 564, 568 (2005) (prohibiting capital punishment for offenders younger than 18 where 18 of 38 death-penalty States precluded imposition of the penalty on persons under 18 and the remaining 12 States did not permit capital punishment at all); *Atkins* v. *Virginia*, 536 U. S. 304, 314–315 (2002) (prohibiting capital punishment of mentally retarded persons where 18 of 38 death-penalty States precluded imposition of the penalty on such persons and the remaining States did not authorize capital punishment at all); *Thompson* v. *Oklahoma,* 487 U. S. 815, 826, 829 (1988) (plurality opinion) (prohibiting capital punishment of offenders under 16 where 18 of 36 death-penalty States precluded imposition of the penalty on such persons and the remaining States did not permit capital punishment at all); *Enmund* v. *Florida,* 458 U. S. 782, 789 (1982) (prohibiting capital punishment for felony murder without proof of intent to kill where eight States allowed the punishment without proof of that element); *Coker* v. *Georgia*, 433 U. S. 584, 593 (1977) (holding capital punishment for the rape of a woman unconstitutional where "[a]t no time in the last 50 years have a majority of the States authorized death as a punishment for rape").

latures crack[ed] down on juvenile crime"); *ibid.* (noting
that, during that period, "legislatures in 47 States and the
District of Columbia enacted laws that made their juvenile
justice systems more punitive," principally by "ma[king] it
easier to transfer juvenile offenders from the juvenile
justice system to the [adult] criminal justice system"); *id.*,
at 104. This, in my view, reveals the States' widespread
agreement that juveniles can sometimes act with the same
culpability as adults and that the law should permit
judges and juries to consider adult sentences—including
life without parole—in those rare and unfortunate cases.
See Feld, Unmitigated Punishment: Adolescent Criminal
Responsibility and LWOP Sentences, 10 J. Law & Family
Studies 11, 69–70 (2007) (noting that life-without-parole
sentences for juveniles have increased since the 1980's);
Amnesty International & Human Rights Watch, The Rest
of Their Lives: Life Without Parole for Child Offenders in
the United States 2, 31 (2005) (same).

Second, legislatures have moved away from parole over
the same period. Congress abolished parole for federal
offenders in 1984 amid criticism that it was subject to
"gamesmanship and cynicism," Breyer, Federal Sentenc-
ing Guidelines Revisited, 11 Fed. Sentencing Rep. 180
(1999) (discussing the Sentencing Reform Act of 1984, 98
Stat. 1987), and several States have followed suit, see T.
Hughes, D. Wilson, & A. Beck, Dept. of Justice, Bureau of
Justice Statistics, Trends in State Parole, 1990–2000, p. 1
(2001) (noting that, by the end of 2000, 16 States had
abolished parole for all offenses, while another 4 States
had abolished it for certain ones). In light of these devel-
opments, the argument that there is nationwide consensus
that parole must be available to offenders less than 18
years old in *every* nonhomicide case simply fails.

## B

The Court nonetheless dismisses existing legislation,

pointing out that life-without-parole sentences are rarely imposed on juvenile nonhomicide offenders—123 times in recent memory[9] by the Court's calculation, spread out across 11 States.[10] *Ante*, at 11–13. Based on this rarity of use, the Court proclaims a consensus against the practice, implying that laws allowing it either reflect the consensus of a prior, less civilized time or are the work of legislatures tone-deaf to moral values of their constituents that this Court claims to have easily discerned from afar. See *ante*, at 11.

This logic strains credulity. It has been rejected before. *Gregg* v. *Georgia*, 428 U. S. 153, 182 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) ("[T]he relative

———————

[9] I say "recent memory" because the research relied upon by the Court provides a headcount of juvenile nonhomicide offenders presently incarcerated in this country, but does not provide more specific information about all of the offenders, such as the dates on which they were convicted.

[10] When issued, the Court's opinion relied on a letter the Court had requested from the Bureau of Prisons (BOP), which stated that there were six juvenile nonhomicide offenders then serving life-without-parole sentences in the federal system. After the Court released its opinion, the Acting Solicitor General disputed the BOP's calculations and stated that none of those six offenders was serving a life without parole sentence solely for a juvenile nonhomicide crime completed before the age of 18. See Letter from Neal Kumar Katyal, Acting Solicitor General, U. S. Dept. of Justice, to Clerk of the Supreme Court (May 24, 2010) (available in Clerk of Court's case file) (noting that five of the six inmates were convicted for participation in unlawful conspiracies that began when they were juveniles but continued after they reached the age of 18, and noting that the sixth inmate was convicted of murder as a predicate offense under the Racketeer Influenced and Corrupt Organizations Act). The Court has amended its opinion in light of the Acting Solicitor General's letter. In my view, the inconsistency between the BOP's classification of these six offenders and the Solicitor General's is irrelevant. The fact remains that federal law, and the laws of a supermajority of States, permit this sentencing practice. And, as will be explained, see *infra* this page and 16–20, judges and jurors have chosen to impose this sentence in the very worst cases they have encountered.

infrequency of jury verdicts imposing the death sentence
does not indicate rejection of capital punishment *per se*.
Rather, [it] . . . may well reflect the humane feeling that
this most irrevocable of sanctions should be reserved for a
small number of extreme cases"). It should also be re-
jected here. That a punishment is rarely imposed demon-
strates nothing more than a general consensus that it
should be just that—rarely imposed. It is not proof that
the punishment is one the Nation abhors.

The Court nonetheless insists that the 26 States that
authorize this penalty, but are not presently incarcerating
a juvenile nonhomicide offender on a life-without-parole
sentence, cannot be counted as approving its use. The
mere fact that the laws of a jurisdiction permit this pen-
alty, the Court explains, "does not indicate that the pen-
alty has been endorsed through deliberate, express, and
full legislative consideration." *Ante*, at 16.

But this misapplies the Court's own evolving standards
test. Under that test, "[i]t is not the burden of [a State] to
establish a national consensus *approving* what their citi-
zens have voted to do; rather, it is the 'heavy burden' of
petitioners to establish a national consensus *against* it."
*Stanford* v. *Kentucky*, 492 U. S. 361, 373 (1989) (quoting
*Gregg*, *supra*, at 175 (joint opinion of Stewart, Powell, and
STEVENS, JJ.); some emphasis added). In light of this fact,
the Court is wrong to equate a jurisdiction's disuse of a
legislatively authorized penalty with its moral opposition
to it. The fact that the laws of a jurisdiction permit this
sentencing practice demonstrates, at a minimum, that the
citizens of that jurisdiction find tolerable the possibility
that a jury of their peers could impose a life-without-
parole sentence on a juvenile whose nonhomicide crime is
sufficiently depraved.

The recent case of 16-year-old Keighton Budder illus-
trates this point. Just weeks before the release of this
opinion, an Oklahoma jury sentenced Budder to life with-

out parole after hearing evidence that he viciously attacked a 17-year-old girl who gave him a ride home from a party. See Stogsdill, Teen Gets Life Terms in Stabbing, Rape Case, Tulsa World, Apr. 2, 2010, p. A10; Stogsdill, Delaware County Teen Sentenced in Rape, Assault Case, Tulsa World, May 4, 2010, p. A12. Budder allegedly put the girl's head "'into a headlock and sliced her throat,'" raped her, stabbed her about 20 times, beat her, and pounded her face into the rocks alongside a dirt road. Teen Gets Life Terms in Stabbing, Rape Case, at A10. Miraculously, the victim survived. *Ibid.*

Budder's crime was rare in its brutality. The sentence the jury imposed was also rare. According to the study relied upon by this Court, Oklahoma had no such offender in its prison system before Budder's offense. P. Annino, D. Rasmussen, & C. Rice, Juvenile Life Without Parole for Non-Homicide Offenses: Florida Compared to Nation 2, 14 (Sept. 14, 2009) (Table A). Without his conviction, therefore, the Court would have counted Oklahoma's citizens as morally opposed to life-without-parole sentences for juveniles nonhomicide offenders.

Yet Oklahoma's experience proves the inescapable flaw in that reasoning: Oklahoma citizens have enacted laws that allow Oklahoma juries to consider life-without-parole sentences in juvenile nonhomicide cases. Oklahoma juries invoke those laws rarely—in the unusual cases that they find exceptionally depraved. I cannot agree with the Court that Oklahoma citizens should be constitutionally disabled from using this sentencing practice merely because they have not done so more frequently. If anything, the rarity of this penalty's use underscores just how judicious sentencing judges and juries across the country have been in invoking it.

This fact is entirely consistent with the Court's intuition that juveniles *generally* are less culpable and more capable of growth than adults. See *infra,* at 21–22. Graham's own

case provides another example. Graham was statutorily
eligible for a life-without-parole sentence after his first
crime. But the record indicates that the trial court did not
give such a sentence serious consideration at Graham's
initial plea hearing. It was only after Graham subse-
quently violated his parole by invading a home at gun-
point that the maximum sentence was imposed.

In sum, the Court's calculation that 123 juvenile non-
homicide life-without-parole sentences have been imposed
nationwide in recent memory, even if accepted, hardly
amounts to strong evidence that the sentencing practice
offends our common sense of decency.[11]

---

[11] Because existing legislation plainly suffices to refute any consensus
against this sentencing practice, I assume the accuracy of the Court's
evidence regarding the frequency with which this sentence has been
imposed. But I would be remiss if I did not mention two points about
the Court's figures. First, it seems odd that the Court counts only those
juveniles sentenced to life without parole and excludes from its analysis
all juveniles sentenced to lengthy term-of-years sentences (*e.g.*, 70 or 80
years' imprisonment). It is difficult to argue that a judge or jury
imposing such a long sentence—which effectively denies the offender
any material opportunity for parole—would express moral outrage at a
life-without-parole sentence.

Second, if objective indicia of consensus were truly important to the
Court's analysis, the statistical information presently available would
be woefully inadequate to form the basis of an Eighth Amendment rule
that can be revoked only by constitutional amendment. The only
evidence submitted to this Court regarding the frequency of this sen-
tence's imposition was a single study completed after this Court
granted certiorari in this case. See P. Annino, D. Rasmussen, & C.
Rice, Juvenile Life Without Parole for Non-Homicide Offenses: Florida
Compared to Nation 2 (Sept. 14, 2009). Although I have no reason to
question the professionalism with which this study was conducted, the
study itself acknowledges that it was incomplete and the first of its
kind. See *id.*, at 1. The Court's questionable decision to "complete" the
study on its own does not materially increase its reliability. For one
thing, by finishing the study itself, the Court prohibits the parties from
ever disputing its findings. Complicating matters further, the original
study sometimes relied on third-party data rather than data from the
States themselves, see *ibid.;* the study has never been peer reviewed;

Finally, I cannot help but note that the statistics the Court finds inadequate to justify the penalty in this case are stronger than those supporting at least one other penalty this Court has upheld. Not long ago, this Court, joined by the author of today's opinion, upheld the application of the death penalty against a 16-year-old, despite the fact that no such punishment had been carried out on a person of that age in this country in nearly 30 years. See *Stanford*, 492 U. S., at 374. Whatever the statistical frequency with which life-without-parole sentences have been imposed on juvenile nonhomicide offenders in the last 30 years, it is surely greater than zero.

In the end, however, objective factors such as legislation and the frequency of a penalty's use are merely ornaments in the Court's analysis, window dressing that accompanies its judicial fiat.[12] By the Court's own decree, "[c]ommunity

—————

and specific data on all 123 offenders (age, date of conviction, crime of conviction, etc.), have not been collected, making verification of the Court's headcount impossible. The Court inexplicably blames Florida for all of this. See *ante*, at 12. But as already noted, it is not Florida's burden to collect data to prove a national consensus in favor of this sentencing practice, but Graham's "heavy burden" to prove a consensus *against* it. See *supra*, at 16.

[12] I confine to a footnote the Court's discussion of foreign laws and sentencing practices because past opinions explain at length why such factors are irrelevant to the meaning of our Constitution or the Court's discernment of any longstanding tradition in *this* Nation. See *Atkins*, 536 U. S., at 324–325 (Rehnquist, C. J., dissenting). Here, two points suffice. First, despite the Court's attempt to count the actual number of juvenile nonhomicide offenders serving life-without-parole sentences in other nations (a task even more challenging than counting them within our borders), the *laws* of other countries permit juvenile life-without-parole sentences, see Child Rights Information, Network, C. de la Vega, M. Montesano, & A. Solter, Human Rights Advocates, Statement on Juvenile Sentencing to Human Rights Council, 10th Sess. (Nov. 3, 2009) ("Eleven countries have laws with the potential to permit the sentencing of child offenders to life without the possibility of release," online at http://www.crin.org/resources/infoDetail.asp?ID=19806) (as visited May 14, 2010, and available in Clerk of Court's case file)).

consensus . . . is not itself determinative." *Ante*, at 16. Only the independent moral judgment of this Court is sufficient to decide the question. See *ibid.*

C

Lacking any plausible claim to consensus, the Court shifts to the heart of its argument: its "independent judgment" that this sentencing practice does not "serv[e] legitimate penological goals." *Ante*, at 16–17. The Court begins that analysis with the obligatory preamble that "'[t]he Eighth Amendment does not mandate adoption of any one penological theory,'" *ante*, at 20 (quoting *Harmelin*, 501 U. S., at 999 (opinion of KENNEDY, J.)), then promptly mandates the adoption of the theories the Court deems best.

First, the Court acknowledges that, at a minimum, the imposition of life-without-parole sentences on juvenile nonhomicide offenders serves two "legitimate" penological goals: incapacitation and deterrence. *Ante*, at 21–23. By definition, such sentences serve the goal of incapacitation by ensuring that juvenile offenders who commit armed burglaries, or those who commit the types of grievous sex crimes described by THE CHIEF JUSTICE, no longer threaten their communities. See *ante*, at 9 (opinion concurring in judgment). That should settle the matter, since the Court acknowledges that incapacitation is an "important" penological goal. *Ante*, at 22. Yet, the Court finds this goal *"inadequate"* to justify the life-without-parole sentences here. *Ante,* at 22 (emphasis added). A similar fate befalls deterrence. The Court acknowledges that such sentences will deter future juvenile offenders, at least to

_____

Second, present legislation notwithstanding, democracies around the world remain free to adopt life-without-parole sentences for juvenile offenders tomorrow if they see fit. Starting today, ours can count itself among the few in which judicial decree prevents voters from making that choice.

some degree, but rejects that penological goal, not as illegitimate, but as insufficient. *Ante*, at 21 ("[A]ny limited deterrent effect provided by life without parole is *not enough* to justify the sentence." (emphasis added)).

The Court looks more favorably on rehabilitation, but laments that life-without-parole sentences do little to promote this goal because they result in the offender's permanent incarceration. *Ante*, at 23. Of course, the Court recognizes that rehabilitation's "utility and proper implementation" are subject to debate. *Ante,* at 23. But that does not stop it from declaring that a legislature may not "forswea[r] . . . the rehabilitative ideal." *Ibid.* In other words, the Eighth Amendment does not mandate "any one penological theory," *ante*, at 20 (internal quotation marks omitted), just one the Court approves.

Ultimately, however, the Court's "independent judgment" and the proportionality rule itself center on retribution—the notion that a criminal sentence should be proportioned to "'the personal culpability of the criminal offender.'" *Ante*, at 16, 20–21 (quoting *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987)). The Court finds that retributive purposes are not served here for two reasons.

1

First, quoting *Roper*, 543 U. S., at 569–570, the Court concludes that juveniles are less culpable than adults because, as compared to adults, they "have a '"lack of maturity and an underdeveloped sense of responsibility,"'" and "their characters are 'not as well formed.'" *Ante*, at 17. As a general matter, this statement is entirely consistent with the evidence recounted above that judges and juries impose the sentence at issue quite infrequently, despite legislative authorization to do so in many more cases. See Part III–B, *supra.* Our society tends to treat the average juvenile as less culpable than the average adult. But the question here does not involve the average

juvenile. The question, instead, is whether the Constitution prohibits judges and juries from *ever* concluding that an offender under the age of 18 has demonstrated sufficient depravity and incorrigibility to warrant his permanent incarceration.

In holding that the Constitution imposes such a ban, the Court cites "developments in psychology and brain science" indicating that juvenile minds "continue to mature through late adolescence," *ante*, at 17 (citing Brief for American Medical Association et al. as *Amici Curiae* 16–24; Brief for American Psychological Association et al. as *Amici Curiae* 22–27 (hereinafter APA Brief)), and that juveniles are "more likely [than adults] to engage in risky behaviors," *id.*, at 7. But even if such generalizations from social science were relevant to constitutional rulemaking, the Court misstates the data on which it relies.

The Court equates the propensity of a fairly substantial number of youths to engage in "risky" or antisocial behaviors with the propensity of a much smaller group to commit violent crimes. *Ante*, at 25–29. But research relied upon by the *amici* cited in the Court's opinion differentiates between adolescents for whom antisocial behavior is a fleeting symptom and those for whom it is a lifelong pattern. See Moffitt, Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy, 100 Psychological Rev. 674, 678 (1993) (cited in APA Brief 8, 17, 20) (distinguishing between adolescents who are "antisocial only during adolescence" and a smaller group who engage in antisocial behavior "at every life stage" despite "drift[ing] through successive systems aimed at curbing their deviance"). That research further suggests that the pattern of behavior in the latter group often sets in before 18. See Moffitt*, supra*, at 684 ("The well-documented resistance of antisocial personality disorder to treatments of all kinds seems to suggest that the life-course-persistent style is fixed sometime before age

18"). And, notably, it suggests that violence itself is evidence that an adolescent offender's antisocial behavior is *not* transient. See Moffitt, A Review of Research on the Taxonomy of Life-Course Persistent Versus Adolescence-Limited Antisocial Behavior, in Taking Stock: the Status of Criminological Theory 277, 292–293 (F. Cullen, J. Wright, & K. Blevins eds. 2006) (observing that "life-course persistent" males "tended to specialize in serious offenses (carrying a hidden weapon, assault, robbery, violating court orders), whereas adolescence-limited" ones "specialized in non-serious offenses (theft less than $5, public drunkenness, giving false information on application forms, pirating computer software, etc.)").

In sum, even if it were relevant, none of this psychological or sociological data is sufficient to support the Court's "'moral'" conclusion that youth defeats culpability in *every* case. *Ante*, at 18 (quoting *Roper*, 543 U. S., at 570); see *id.*, at 618 (SCALIA, J., dissenting); R. Epstein, The Case Against Adolescence 171 (2007) (reporting on a study of juvenile reasoning skills and concluding that "most teens are capable of conventional, adult-like moral reasoning").

The Court responds that a categorical rule is nonetheless necessary to prevent the "'unacceptable likelihood'" that a judge or jury, unduly swayed by "'the brutality or cold-blooded nature'" of a juvenile's nonhomicide crime, will sentence him to a life-without-parole sentence for which he possesses "'insufficient culpability,'" *ante*, at 27 (quoting *Roper*, *supra*, at 572–573). I find that justification entirely insufficient. The integrity of our criminal justice system depends on the ability of citizens to stand between the defendant and an outraged public and dispassionately determine his guilt and the proper amount of punishment based on the evidence presented. That process necessarily admits of human error. But so does the process of judging in which we engage. As between the two, I find far more "unacceptable" that this Court,

swayed by studies reflecting the general tendencies of youth, decree that the people of this country are not fit to decide for themselves when the rare case requires different treatment.

2

That is especially so because, in the end, the Court does not even believe its pronouncements about the juvenile mind. If it did, the categorical rule it announces today would be most peculiar because it leaves intact state and federal laws that permit life-without-parole sentences for juveniles who commit homicides. See *ante*, at 18–19. The Court thus acknowledges that there is nothing inherent in the psyche of a person less than 18 that prevents him from acquiring the moral agency necessary to warrant a life-without-parole sentence. Instead, the Court rejects over-whelming legislative consensus only on the question of which *acts* are sufficient to demonstrate that moral agency.

The Court is quite willing to accept that a 17-year-old who pulls the trigger on a firearm can demonstrate suffi-cient depravity and irredeemability to be denied reentry into society, but insists that a 17-year-old who rapes an 8-year-old and leaves her for dead does not. See *ante*, at 17–19; cf. *ante*, at 9 (ROBERTS, C. J., concurring in judgment) (describing the crime of life-without-parole offender Mi-lagro Cunningham). Thus, the Court's conclusion that life-without-parole sentences are "grossly disproportion-ate" for juvenile nonhomicide offenders in fact has very little to do with its view of juveniles, and much more to do with its perception that "defendants who do not kill, in-tend to kill, or foresee that life will be taken are categori-cally less deserving of the most serious forms of punish-ment than are murderers." *Ante*, at 18.

That the Court is willing to impose such an exacting constraint on democratic sentencing choices based on such an untestable philosophical conclusion is remarkable. The

question of what acts are "deserving" of what punishments is bound so tightly with questions of morality and social conditions as to make it, almost by definition, a question for legislative resolution. It is true that the Court previously has relied on the notion of proportionality in holding certain classes of offenses categorically exempt from capital punishment. See *supra*, at 4. But never before today has the Court relied on its own view of just deserts to impose a categorical limit on the imposition of a lesser punishment. Its willingness to cross that well-established boundary raises the question whether any democratic choice regarding appropriate punishment is safe from the Court's ever-expanding constitutional veto.

## IV

Although the concurrence avoids the problems associated with expanding categorical proportionality review to noncapital cases, it employs noncapital proportionality analysis in a way that raises the same fundamental concern. Although I do not believe *Solem* merits *stare decisis* treatment, Graham's claim cannot prevail even under that test (as it has been limited by the Court's subsequent precedents). *Solem* instructs a court first to compare the "gravity" of an offender's conduct to the "harshness of the penalty" to determine whether an "inference" of gross disproportionality exists. 463 U. S., at 290–291. Only in "the rare case" in which such an inference is present should the court proceed to the "objective" part of the inquiry—an intra- and interjurisdictional comparison of the defendant's sentence with others similarly situated. *Harmelin*, 501 U. S., at 1000, 1005 (opinion of KENNEDY, J.).

Under the Court's precedents, I fail to see how an "inference" of gross disproportionality arises here. The concurrence notes several arguably mitigating facts—Graham's "lack of prior criminal convictions, his youth and

immaturity, and the difficult circumstances of his upbringing." *Ante*, at 7 (ROBERTS, C. J., concurring in judgment). But the Court previously has upheld a life-without-parole sentence imposed on a first-time offender who committed a *nonviolent* drug crime. See *Harmelin, supra*, at 1002–1004. Graham's conviction for an actual violent felony is surely more severe than that offense. As for Graham's age, it is true that *Roper* held juveniles categorically ineligible for capital punishment, but as the concurrence explains, *Roper* was based on the "explicit conclusion that [juveniles] 'cannot with reliability be classified among the *worst* offenders'"; it did "not establish that juveniles can never be eligible for life without parole." *Ante*, at 5 (ROBERTS, C. J., concurring in judgment) (quoting *Roper*, 543 U. S., at 569 (emphasis added in opinion of ROBERTS, C. J.)). In my view, *Roper*'s principles are thus not generally applicable outside the capital sentencing context.

By holding otherwise, the concurrence relies on the same type of subjective judgment as the Court, only it restrains itself to a case-by-case rather than a categorical ruling. The concurrence is quite ready to hand Graham "the general presumption of diminished culpability" for juveniles, *ante*, at 7, apparently because it believes that Graham's armed burglary and home invasion crimes were "certainly less serious" than murder or rape, *ibid*. It recoils only from the prospect that the Court would extend the same presumption to a juvenile who commits a sex crime. See *ante*, at 10. I simply cannot accept that these subjective judgments of proportionality are ones the Eighth Amendment authorizes us to make.

The "objective" elements of the *Solem* test provide no additional support for the concurrence's conclusion. The concurrence compares Graham's sentence to "similar" sentences in Florida and concludes that Graham's sentence was "far more severe." *Ante*, at 8 (ROBERTS, C. J, concurring in judgment). But strangely, the concurrence

uses average sentences for burglary or robbery offenses as examples of "similar" offenses, even though it seems that a run-of-the-mill burglary or robbery is not at all similar to Graham's criminal history, which includes a charge for armed burglary *with assault*, *and* a probation violation for invading a home at gunpoint.

And even if Graham's sentence is higher than ones he might have received for an armed burglary with assault in other jurisdictions, see *ante*, at 8–9, this hardly seems relevant if one takes seriously the principle that "'[a]bsent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will *always* bear the distinction of treating particular offenders more severely than any other State.'" *Harmelin*, *supra*, at 1000 (opinion of KENNEDY, J.) (quoting *Rummel*, 445 U. S., at 282; emphasis added). Applying *Solem*, the Court has upheld a 25-years-to-life sentence for theft under California's recidivist statute, despite the fact that the State and its *amici* could cite only "a single instance of a similar sentence imposed outside the context of California's three strikes law, out of a prison population [then] approaching two million individuals." *Ewing*, 538 U. S., at 47 (BREYER, J., dissenting). It has also upheld a life-without-parole sentence for a first-time drug offender in Michigan charged with possessing 672 grams of cocaine despite the fact that only one other State would have authorized such a stiff penalty for a first-time drug offense, and even that State required a far greater quantity of cocaine (10 kilograms) to trigger the penalty. See *Harmelin*, *supra*, at 1026 (White, J., dissenting). Graham's sentence is certainly less rare than the sentences upheld in these cases, so his claim fails even under *Solem*

\* \* \*

Both the Court and the concurrence claim their decisions to be narrow ones, but both invite a host of line-

drawing problems to which courts must seek answers beyond the strictures of the Constitution. The Court holds that "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," but must provide the offender with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Ante*, at 24. But what, exactly, does such a "meaningful" opportunity entail? When must it occur? And what Eighth Amendment principles will govern review by the parole boards the Court now demands that States empanel? The Court provides no answers to these questions, which will no doubt embroil the courts for years.[13]

## V

The ultimate question in this case is not whether a life-without-parole sentence 'fits' the crime at issue here or the crimes of juvenile nonhomicide offenders more generally, but to whom the Constitution assigns that decision. The Florida Legislature has concluded that such sentences should be available for persons under 18 who commit certain crimes, and the trial judge in this case decided to impose that legislatively authorized sentence here. Because a life-without-parole prison sentence is not a "cruel and unusual" method of punishment under any standard,

---

[13] It bears noting that Colorado, one of the five States that prohibit life-without-parole sentences for juvenile nonhomicide offenders, permits such offenders to be sentenced to mandatory terms of imprisonment for up to 40 years. Colo. Rev. Stat. §18–1.3–401(4)(b) (2009). In light of the volume of state and federal legislation that presently *permits* life-without-parole sentences for juvenile nonhomicide offenders, it would be impossible to argue that there is any objective evidence of agreement that a juvenile is constitutionally entitled to a parole hearing any sooner than 40 years after conviction. See Tr. of Oral Arg. 6–7 (counsel for Graham, stating that, "[o]ur position is that it should be left up to the States to decide. We think that the . . . Colorado provision would probably be constitutional").

the Eighth Amendment gives this Court no authority to reject those judgments.

It would be unjustifiable for the Court to declare otherwise even if it could claim that a bare majority of state laws supported its independent moral view. The fact that the Court categorically prohibits life-without-parole sentences for juvenile nonhomicide offenders in the face of an overwhelming legislative majority *in favor* of leaving that sentencing option available under certain cases simply illustrates how far beyond any cognizable constitutional principle the Court has reached to ensure that its own sense of morality and retributive justice pre-empts that of the people and their representatives.

I agree with JUSTICE STEVENS that "[w]e learn, sometimes, from our mistakes." *Ante*, at 1 (concurring opinion). Perhaps one day the Court will learn from this one.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 08–7412

TERRANCE JAMAR GRAHAM, PETITIONER *v.*
FLORIDA

ON WRIT OF CERTIORARI TO THE DISTRICT COURT OF APPEAL
OF FLORIDA, FIRST DISTRICT

[May 17, 2010; modified July 6, 2010]

JUSTICE ALITO, dissenting.

I join Parts I and III of JUSTICE THOMAS's dissenting opinion. I write separately to make two points.

*First*, the Court holds only that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of *life without parole*." *Ante*, at 24 (emphasis added). Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole. Indeed, petitioner conceded at oral argument that a sentence of as much as 40 years without the possibility of parole "probably" would be constitutional. Tr. of Oral Arg. 6–7; see also *ante*, at 28, n. 12 (THOMAS, J., dissenting).

*Second*, the question whether petitioner's sentence violates the narrow, as-applied proportionality principle that applies to noncapital sentences is not properly before us in this case. Although petitioner asserted an as-applied proportionality challenge to his sentence before the Florida courts, see 982 So. 2d 43, 51–53 (Fla. App. 2008), he did not include an as-applied claim in his petition for certiorari or in his merits briefs before this Court. Instead, petitioner argued for only a categorical rule banning the imposition of life without parole on *any* juvenile convicted of a nonhomicide offense. Because petitioner abandoned his as-applied claim, I would not reach that issue.

See this Court's Rule 14.1(a); *Yee* v. *Escondido*, 503 U. S. 519, 534–538 (1992).